COMMONWEALTH *vs.* ROCCO LAMATTINA
(and three companion cases).

Middlesex.   March 11, 1974. — April 30, 1974.

Present: HALE, C.J., KEVILLE, & ARMSTRONG, JJ.

*Practice, Criminal,* Recording of proceedings, Judicial discretion, Discovery, Disclosure of evidence before grand jury.  *Conspiracy. Evidence,* Acts and declarations of conspirator.

Failure to have a hearing on pre-trial motions in a criminal case transcribed did not violate the defendants' right to appellate review of the action on the motions where it appeared that no testimony was taken at the hearing.  [207-209]

No abuse of judicial discretion was shown in a criminal case in only a partial allowance of motions by the defendants for discovery of statements by them and others and for inspection of grand jury minutes, and in denial of motions by the defendants for a list of witnesses who had not testified before the grand jury but were expected to testify at trial.  [209]

Where the prosecutor at a criminal trial used some of the testimony of certain witnesses before the grand jury to refresh their recollections or to show a prior inconsistent statement, and the defendants then requested access to the entire grand jury testimony of such witnesses, there was no error in a ruling by the judge limiting the defendants' access to the portions of the testimony actually used by the prosecutor and any "immediately relevant material."  [209-211]

At a trial for conspiracy to commit arson of a store, a ruling, made by the judge near the close of the Commonwealth's case, that if the jury found the existence of a conspiracy they could consider the acts and declarations of each conspirator before a fire at the store against each of the other conspirators, disclosed no error where at the time of the ruling ample evidence of the existence of a conspiracy had been introduced, notwithstanding that the ruling was made without prior notice to counsel, that much of the evidence of the existence of a conspiracy was circumstantial and much of it was given by an unindicted accomplice of the defendants, and that two of the defendants might not have joined the conspiracy at its inception.  [211-213]

The evidence at a trial for conspiracy to commit arson of a furniture store warranted a finding of guilty of one of the defendants; it

could not be said that as to him the evidence merely supported equally the inconsistent propositions of his guilt and innocence. [213]

INDICTMENTS found and returned in the Superior Court on May 13, 1971.

Pre-trial motions were heard by *Ford, J.* The cases were tried before *Campbell, J.*

*Daniel F. Toomey* for the defendant DeStefano & others.

*Chester C. Paris* for the defendant Lamattina.

*Barbara A. H. Smith,* Assistant Attorney General, for the Commonwealth.

HALE, C.J. At a jury trial held subject to the provisions of G. L. c. 278, §§ 33A-33G, the four defendants (Rocco Lamattina, John Cefalo, William DeStefano, and Alfred Sarno) were convicted on separate indictments charging conspiracy to commit arson. The defendants Cefalo, DeStefano, and Sarno have briefed and argued several assignments of error concerning: (1) the denial of certain pre-trial motions and the nonexistence of a transcript of the pre-trial proceedings; (2) the ruling by the trial judge limiting their access to portions of the grand jury testimony of certain Commonwealth witnesses; and (3) the judge's ruling, made without affording them the opportunity to present opposing arguments, that sufficient evidence of a conspiracy had been introduced to warrant the jury's consideration of the acts and declarations of each alleged coconspirator against each of the others. The defendant Lamattina is here on a single assignment of error as to the denial of his motion for a directed verdict.

We summarize the evidence. The gist of the Commonwealth's case was that the four defendants, and a fifth coconspirator who was not indicted, conspired to have a furniture store in Woburn, in which at least some of the five had a financial interest, destroyed by fire. Pursuant to the alleged conspiracy they arranged to have much of the store's inventory removed from the premises before the fire so as to minimize the actual loss and to maximize the gain realized from insurance proceeds.

The furniture business in question was organized in May, 1970, when John Giardini, the unindicted coconspirator, met with the defendants Lamattina and Sarno. A corporation, Woburn Furniture Sales, Inc., was formed; its officers included one Poulos, who was asked by Giardini to serve as president; one Braccia, who was Sarno's daughter; and one Waldmyer, who was Lamattina's daughter. Giardini arranged for the renting of premises for the store in Woburn; premises were leased to the corporation in the names of Poulos and one DeVito. Giardini testified that "John DeVito" was an alias used by him. Later in 1970 the corporation was re-formed as J. Tanner's Furniture, Inc. (Tanner's). One Carifio became treasurer at Sarno's request, and a new lease for the same premises was negotiated. At Sarno's request Carifio signed as lessee.

Carifio testified that as treasurer of Tanner's he gave the defendant Lamattina mortgages totaling $67,000; that money to finance the store came from the R. J. D. Realty Trust, of which Lamattina was the trustee; that $13,000 was put into the store's bank account; and that he had no knowledge of whether $67,000 was ever advanced to the corporation.

One Nesson testified that he had been hired by Sarno to manage the store. Nesson testified that Lamattina came to the store regularly, and that Lamattina informed him "that he [Lamattina] was the boss," and that Nesson should listen only to him. He related a conversation in which Lamattina and Sarno had said "that whenever the store went bankrupt or had a fire or anything, I [Nesson] would share in the profits." He testified that about one week after that conversation Sarno and Lamattina asked him to order large quantities of merchandise for the store and that he did so. Nesson also related the substance of two other conversations which occurred in the presence of Sarno, Lamattina, and Giardini, in which Nesson was again told he would share in the profits "when we had a fire or went bankrupt."

Giardini testified in detail as to the business activities of the store. He opened a checking account for the store using the name of "John DeVito." He testified that he and Sarno ordered furniture for the store, using aliases. Most of the merchandise was purchased on credit. He further testified that late in 1970 he expressed his concern to Sarno that he was "going to wind up with nothing," to which Sarno responded, "Don't worry. At the end, you will be taken care of." He stated that Sarno had told him that Lamattina had been removing quantities of merchandise from the store. Giardini testified that the defendants Cefalo and DeStefano were coming to the store regularly in late 1970. Shortly before Christmas, 1970, Giardini again expressed his concern to Sarno about the future of the business; Sarno told Giardini to " [t]ry to stall the salesmen and everybody and wait until after Christmas, and whatever we sell, we will pay."

Giardini then related a subsequent conversation in which Sarno told Giardini that " [t]he place has come to an end. Mr. Lamattina is hollering . . . he wants the place burned." Giardini further testified that on Saturday, January 9, 1971, while he was at Tanner's, he overheard Sarno tell Cefalo and DeStefano, "We are ready to let the place go up next week." Giardini testified that they replied, "We are all ready." Giardini stated that on Tuesday, January 12, 1971, Sarno instructed him to go to the store the next day to activate the alarm system and to " [s]tay there ten, fifteen minutes, and don't stay no longer." Giardini testified that he followed those instructions. Upon arriving at the store, Giardini observed that "there wasn't much stuff left" in the store at that time; he also smelled an odor "like gasoline or something" at the rear of the store.

Giardini further testified that he telephoned an F. B. I. agent and informed him that "the place was going to be burned that night." The F. B. I. agent corroborated that testimony. The Commonwealth introduced evidence of the occurrence of a fire at the premises on January 13,

1971; the Woburn fire chief testified that in his opinion the fire had been purposely set although it could have been caused by accident. Giardini also testified that he met with Lamattina and Sarno after the fire, at which time Sarno remarked, "Everything went all right," and Lamattina stated, "When everything is settled, you will be well taken care of."

The Commonwealth introduced testimony that Tanner's was delinquent in paying its heating bills. One Carino, an executive of the company which supplied heating oil to Tanner's, testified that on one occasion shortly before the fire (he was unable to recall the exact day), he went to the premises to see about getting paid. He testified that "the place was locked up" but that the defendants Cefalo and DeStefano could be seen inside the store. They asked Carino to leave some oil, but Carino refused to do so. Sarno arrived shortly thereafter, and Carino testified that he and Sarno "exchanged words about the place was supposed to have been changing hands, [and Sarno asked Carino] to come the next morning and get a check, and could I leave some oil." Carino again refused to leave any oil "until I got some money."

The Commonwealth also introduced evidence that the premises had been insured for $185,000; that the loss payee was the R. J. D. Realty Trust; that on several occasions, including the day of the fire and the two previous days, furniture had been removed from the store and that at least some of this furniture had been transported to a warehouse at Lamattina's request; and that no rent for the premises had been paid during October, November, or December of 1970.

1. A hearing on the defendants' pre-trial motions was held before a judge other than the trial judge on October 21, 1971. It does not appear that any witnesses were called to testify at the hearing. Following the hearing certain motions were denied; the defendants DeStefano, Cefalo, and Sarno have assigned those denials

as error.    As a threshold argument, however, these
defendants maintain that the nonexistence of a transcript
of the pre-trial hearing operates as a denial of their right
to appellate review of the actions taken on the motions.
Under the circumstances disclosed by the record before
us, we fail to see the logic in the defendants' argument.

The docket entries disclose that the motions to have the
trial and pre-trial proceedings made subject to G. L.
c. 278, §§ 33A-33G, were referred to the trial judge, who
subsequently allowed the motions.    On April 7, 1972,
some five months after trial, one Richard Ross[1] was
appointed stenographer "as of October 21, 1971" to take
the evidence on the pre-trial motions.    Ross later became
ill, and a second stenographer was appointed.    On
March 22, 1973, the judge who presided at the pre-trial
hearing filed a "Certification of Court as to Transcript"
wherein he stated that Ross was no longer a court
reporter and that a search of Ross' notes had failed to
yield a transcript of the October, 1971, hearing.    The
judge further stated:    "I did not allow any motion to
take such proceedings under c. 278 . . . there is no
transcript of any such hearing, *at which no testimony
was taken in any event*" (emphasis supplied).

From these circumstances it appears to us that this is
not a situation in which stenographic notes that once
existed were later lost or destroyed but, rather, one in
which no such notes ever existed.    *Commonwealth* v.
*Avery,* 365 Mass. 59, 65 (1974).    Compare *Brooks* v.
*National Shawmut Bank,* 323 Mass. 677, 680-683 (1949).
It cannot be said here that the failure to have the
pre-trial proceedings transcribed amounted to a violation
of the defendants' basic rights to secure appellate review
pursuant to G. L. c. 278, § 31.    The defendants were
free to present arguments to this court concerning the
denial of the motions and have availed themselves of that

---

[1] We infer that Ross was the court stenographer assigned to the
session at which the pre-trial hearing on the motions was held.

opportunity. The nonexistence of notes of the pre-trial hearing, at which no witnesses were called to testify, does not preclude our determination of the propriety of those denials.

In our view the action taken on each motion in question was proper. Motions for discovery of statements made by the defendants and others were allowed only as to written statements signed by the defendants. The granting of such motions is discretionary with the judge, and we perceive no abuse of discretion here. See *Commonwealth* v. *Therrien*, 359 Mass. 500, 507 (1971). Similarly, there was no error in the denial of motions for a list of witnesses who did not testify before the grand jury but who were expected to testify at trial. *Commonwealth* v. *Salerno*, 356 Mass. 642, 648 (1970).[2] The pre-trial motions to inspect grand jury minutes were allowed with respect to the testimony of Giardini, the unindicted coconspirator, but were denied in all other respects. There was no error. *Commonwealth* v. *French*, 357 Mass. 356, 377 (1970). *Commonwealth* v. *De Christoforo*, 360 Mass. 531, 534-535 (1971). See *United States* v. *Budzanoski*, 462 F. 2d 443, 454-455 (3d Cir. 1972); *United States* v. *Parker*, 469 F. 2d 884, 889 (10th Cir. 1972).

2. During the direct and redirect examination of several Commonwealth witnesses the prosecutor used the minutes of the grand jury testimony of the respective witnesses to refresh their recollections or to demonstrate a prior inconsistent statement. The defendants thereupon requested access to the entire grand jury testimony of two

---

[2] The defendants maintain that they were severely prejudiced by the Commonwealth's failure to disclose that Nesson, who did not appear before the grand jury, would testify at trial. A review of the record suggests the possibility of confusion and oversight on this matter and that Nesson's willingness to testify may not have been known to the Commonwealth at the time the request was made. Moreover, the intensity of the cross-examination of Nesson demonstrates that the defendants were not substantially prejudiced by Nesson's "surprise" appearance at trial.

witnesses against whom such testimony had been employed. In each instance the effect of the judge's ruling was to limit access to those portions of the grand jury minutes which had actually been used by the prosecutor. The defendants argue that the imposition of such a limitation constituted error. They argue that once an inconsistency between a witness' grand jury testimony and his trial testimony is shown to exist, the defense is entitled to examine the entire grand jury testimony of that witness.

We are unable to agree. The rule in this Commonwealth applicable at the time of this trial was that a showing of "particularized need" is required before grand jury minutes need be divulged to the requesting party. *Commonwealth* v. *De Christoforo,* 360 Mass. 531, 534-535 (1971).[3] In this Commonwealth there is "no right to a general inspection of the grand jury transcript." *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 578 (1967). It would appear that the particularized need demonstrated here extended only to those portions of the grand jury minutes used by the prosecutor and to which access was granted.[4] We note that the defendants made no request that the trial judge examine the witnesses' grand jury testimony himself to determine whether any other inconsistencies or other testimony helpful to the defense were apparent. See *Commonwealth* v. *Abbott Engr. Inc., supra,* at 579; *Commonwealth* v. *Doherty,* 353 Mass. 197, 210 (1967), overruled on other grounds, *Connor* v. *Commonwealth,* 363 Mass. 572 (1973).

---

[3] The new rule abrogating a showing of particularized need enunciated in *Commonwealth* v. *Stewart,* 365 Mass. 99, 104-106 (1974), applies only prospectively.

[4] An instruction given by the judge to the prosecutor to make available any "immediately relevant material", including questions and answers immediately preceding and following the testimony actually used, does not, in our view, amount to a ruling. The instruction was merely a clarification of the limits imposed by an earlier ruling.

*Commonwealth* v. *Carita,* 356 Mass. 132, 141-142 (1969). Furthermore, the failure of the defendants to have the grand jury minutes incorporated into the record precludes any such determination by this court. Thus, the defendants have not sustained the burden of showing that they were prejudiced by the judge's ruling. See *Commonwealth* v. *De Christoforo, supra,* at 536, n. 2. See also *Commonwealth* v. *Gallinaro,* 360 Mass. 868 (1971). We conclude that the judge's ruling was in accordance with the well established practice in this Commonwealth.

3. During the direct examination of the final witness called by the Commonwealth, the judge invoked the so-called "acts and declarations" rule: he instructed the jury that if they were to find that a conspiracy existed, they could consider the acts and declarations of each alleged coconspirator which were made before the fire against each of the other coconspirators. The effect of that ruling was to remove the limiting instructions carefully imposed by the judge on each occasion when testimony concerning each defendant's acts or declarations had been given. The defendants Cefalo, DeStefano, and Sarno argue that the evidence was insufficient to warrant the judge's ruling and that in any event it was error for the judge so to rule without notifying counsel beforehand. We see no merit in the latter contention. The defendants have cited no authority, nor have we found any, for the proposition that counsel must be afforded the opportunity to present argument in opposition to such a ruling. Compare Rule 71 of the Superior Court (1954).

Our opinion is that the rule was properly invoked. The prerequisite for invoking the rule is a finding by the judge "upon evidence aliunde that a conspiracy exists." *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50 (1965). At the time he made the ruling the judge had before him ample evidence, much of which has already been summarized, of the existence of a conspiracy. Much of that evidence was circumstantial, but it is elementary law

that a "conspiracy may be, and usually is, proved by circumstantial evidence." *Ibid.* The evidence, viewed as a whole, tended to show that a conspiracy was initiated by the defendants Sarno and Lamattina together with the unindicted coconspirator Giardini. The fact that a substantial part of the evidence linking the several defendants to the conspiracy came from the testimony of Giardini, their accomplice, does not render such evidence inadmissible. *Commonwealth* v. *Galvin,* 310 Mass. 733, 746 (1942). See Toomey, Some Procedural Aspects of the Prosecution of a Conspiracy in the Commonwealth of Massachusetts, 53 Mass. L. Q. 207, 242 (1968).

The quantum of evidence tending to connect the defendants Cefalo and DeStefano with the conspiracy may not have been so great as that connecting the other two defendants, but it was sufficient to warrant the judge's ruling. While it is basic law that " [t]here can be no finding of guilt by association" (*Commonwealth* v. *Perry,* 357 Mass. 149, 151 [1970]), it is equally basic that " [i]t is not essential to a conspiracy that parties meet or that they confer or formulate their plans. Common purpose may be inferred from concerted action converging to a definite end." *Commonwealth* v. *Beal,* 314 Mass. 210, 221 (1943). We think the evidence against Cefalo and DeStefano showed more than mere association with the other conspirators. See *United States* v. *Mustone,* 469 F. 2d 970, 973 (1st Cir. 1972); *United States* v. *House,* 471 F. 2d 886, 888 (1st Cir. 1973). The fact that they may not have joined the conspiracy at its inception is immaterial. *Commonwealth* v. *Beal, supra,* at 221-222. One who subsequently joins an already existing conspiracy is "deemed to have adopted the prior acts and declarations of his coconspirators, and their declarations in furtherance of the conspiracy are admissible against him under the coconspirator exception to the hearsay rule." *United States* v. *Sarno,* 456 F. 2d 875, 878 (1st Cir. 1972). Once a conspiracy is shown to have come into existence, "but slight evidence connect-

ing a defendant therewith may still be substantial, and if so, sufficient." *Langel* v. *United States,* 451 F. 2d 957, 962 (8th Cir. 1971). We conclude that the evidence, viewed as a whole, fully warranted the judge's ruling. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 55 (1964).

4. The sole assignment of error argued by the defendant Lamattina concerns the denial of his motion for a directed verdict. In reviewing the propriety of action taken on such a motion, the evidence must be viewed in its aspect most favorable to the Commonwealth. *Commonwealth* v. *Flynn,* 362 Mass. 455, 479 (1972). So viewed, the evidence fully warranted the denial of the motion. We need not reiterate the evidence here. While it could have been found, as the defendant suggests, that Lamattina's action in directing the removal of furniture was as consistent with sound business practice as with a conspiracy to commit arson, it does not follow that the evidence against Lamattina tended to support the propositions of guilt and innocence with equal force. See *Commonwealth* v. *Shea,* 324 Mass. 710, 713 (1949). The evidence concerning the moving of the furniture must be considered together with other evidence of Lamattina's involvement in the conspiracy. "Every piece of evidence by itself does not have to be sufficient to prove the main point at issue. . . . 'Evidence which would be colorless if it stood alone may get a new complexion from other facts which are proved, and in turn may corroborate the conclusion which would be drawn from the other facts.' *Commonwealth* v. *Mulrey,* 170 Mass. 103, 110 [-111 (1898)]." *Commonwealth* v. *Stasiun,* 349 Mass. 38, 51 (1965).

*Judgments affirmed.*