COMMONWEALTH *vs.* ROBERT ADAM SHUMAN.

Hampden. November 10, 1983. — January 27, 1984.

Present: BROWN, CUTTER, & KASS, JJ.

*Burning of Property. Evidence,* Admitted without objection, Polygraphic test. *Practice, Criminal,* New Trial, Sentence, Duplicitous convictions.

At the jury-waived trial of a defendant charged with burning the building in which his business was located, where the evidence, which was largely circumstantial, permitted findings that the defendant possessed one of a limited number of keys to the building, as well as a key to the building's master alarm control, which was turned off before the fire; that the fire had probably been set by someone who had such keys; that the defendant had been experiencing financial difficulties and had insured his business amply, under a policy of insurance which was about to expire; and that the defendant had made numerous statements damaging to his credibility, the judge was warranted in concluding beyond a reasonable doubt that the defendant had set the fire. [442-447]

At the trial of a defendant charged with burning the building in which his business was located, his failure to object to oral testimony as to the provisions of his insurance policy, which itself was never placed in evidence, precluded him from challenging the admissibility of this testimony on appeal. [447-448]

A defendant who, after a jury-waived trial, had been convicted of burning a building was not entitled to a new trial for the purpose of introducing polygraph evidence tending to corroborate his credibility. [448]

The offense of wilfully and maliciously burning a building, G. L. c. 266, § 2, is a lesser-included offense of burning a building with intent to defraud an insurer, G. L. c. 266, § 10, and, consequently, a defendant sentenced on indictments framed under both provisions was entitled to have one of the convictions set aside and that indictment dismissed. [449-452]

INDICTMENTS found and returned in the Superior Court Department on October 16, 1981.

The cases were heard by *Cross,* J.

*Thomas Lesser* for the defendant.

*William T. Walsh, Jr.,* Assistant District Attorney, for the Commonwealth.

CUTTER, J. This is an appeal (1) from Shuman's convictions on June 24, 1982, in a jury-waived trial in the Superior Court of (a) arson of a building (G. L. c. 266, § 2) and (b) burning the same building with intent to defraud the insurer (G. L. c. 266, § 10), and (2) from the denial of his motion for a new trial. The fire was reported to the fire department about 11:35 P.M. on March 24, 1981. There was strong evidence that it had been set on the vacant third floor of a commercial building at 32 Hampden Street, Springfield (the locus) owned by Dr. Harvey Grant. Shuman, a tenant, maintained a hairdressing salon on the second floor. A sprinkler system had contained the fire to the third floor. Shuman's salon was not significantly damaged by fire, but water from the sprinkler system caused considerable injury to it.

1. Shuman first contends that the trial judge should have granted his motions, made both at the close of the Commonwealth's case and at the close of all the evidence, for required findings of not guilty. The evidence was largely circumstantial. On particular issues much of the evidence was conflicting. We conclude that the evidence, viewed in its aspect most favorable to the Commonwealth's position, taken with all permissible inferences from that evidence, was sufficient to allow the trial judge to conclude, beyond a reasonable doubt, that Shuman had set the fire or caused it to be set. See *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976); *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-679 (1979). From the evidence the following circumstances could have been found.

(a) It does not seem seriously to be disputed, in the face of persuasive expert testimony, that the fire had been set on the third floor intentionally with the aid of an accelerant. One expert estimated that three to four gallons of gasoline had been used. No containers for the accelerant used were found, indicating that these had been removed by the person setting the fire. It could be found that the sprinkler system

on the third floor (and the prompt arrival of the fire department) had prevented the whole building from being consumed. The attempt to burn the building, in one expert's opinion, "was poorly done; very unprofessional."

(b) When the firemen arrived, they had to break in the front door leading to the stairs to the second and upper floors. They found a door to the vacant third floor open. All other entrances to the upper floors were locked. A third floor window, accessible from a somewhat shaky fire escape with bolts to the west side of the building missing, was closed, badly warped, and difficult to open. A security device had been recently removed from that window.

(c) There was an alarm system on the second floor which was subject to two separate controls, each also subject to use of a special key. The first was a master control switch located in a back room. The second (dependent for its operation upon the first master switch being in the "on" or "night" position) was outside an entrance door to the second floor. The master control, the judge could have found, was usually left in the "night" or "on" position, with the second, outside control used to activate the alarm at the end of each day. When the fire department arrived, the second switch had been activated but the master switch was in the "off" position. The alarm of the tenant on the first floor was sounding. Shuman's second floor alarm was not sounding. Tested promptly after the fire, the second floor alarm system was found to be operating properly if duly activated.[1]

(d) There was conflicting evidence about the number of keys to the upper floors which had been distributed. The judge would have been warranted in finding that the number was limited. The upper floors could each be reached

---

[1] Cindy Ferus, a belly-dance teacher, taught a class at night in Shuman's hairdressing salon. On the night of the fire she left the second floor about 9:15 P.M., making sure that the outside alarm control (but not the master control, which she did not check) was activated. She had been told that evening by Shuman, when he departed about 7:00 P.M., that she would have to start paying rent for using his second floor salon, which theretofore she had used without charge, perhaps because use of the salon "was a swap for belly dancing lessons for" Shuman's wife.

from the first and second floors by a very slow moving elevator, found after the fire near or above the second floor. There was evidence that it was operable in March, 1981.

(e) There was evidence that Shuman at a bar in Boston in February, 1981, asked a friend and former employee, Richard O'Zemko, when as many as fifteen other hairdressers were at or near the same table, "could anybody burn my business or my building down or something to that effect." O'Zemko, on the stand, claimed that the statement attributed to him had been taken out of context and that he had signed a written statement about Shuman's inquiry under police threats and in the confusion of being placed under arrest. On the stand, O'Zemko appears to have been embarrassed and, perhaps, evasive. There was testimony of others, supposed to have been present, that they had not heard the statement. At the meeting in the bar, Shuman also, in reply to a suggestion that it would be nice if the group of hairdressers could work together again, said (perhaps jokingly) "the only possible way we could probably work together again is if my building burned down or something to that effect." This statement may have been a different version of O'Zemko's account of Shuman's inquiry mentioned above. Another statement (made at some uncertain time) was attributed to Shuman by his landlord's brother, Albert Grant, a caretaker at the locus, that Shuman was "going to take care of this building for" the brother and Albert. Shuman, in effect, denied making each of these statements.[2]

(f) There was somewhat confused and confusing testimony concerning the amount of Shuman's investment in fixtures and improvements for his hairdressing establishment. It could have been found on the evidence that his aggregate investment amounted to around $105,000. Shuman carried $150,000 of insurance (including fire) on the premises, under

---

[2] There was an affidavit filed by the landlord, in connection with the motion for a new trial, that Shuman in fact performed some custodial and tenant-relations services in connection with the locus. The quoted inquiry in the first sentence of subpar. (e) above is the way O'Zemko concluded his direct testimony.

a policy due to expire one week after the fire. This policy was not introduced in evidence. See part 2 of this opinion, *infra*.

(g) There was conflicting evidence about Shuman's financial condition at the time of the fire. A loan (originally $60,000, with a balance of about $30,000 due at the time of the fire) had been made to Shuman by a Springfield bank. Eighty percent of this loan was backed by a Small Business Administration (S.B.A.) guaranty. At the request of the bank, this loan was taken over by S.B.A., but was up to date at the time of trial. After a motorcycle accident in the late spring or early summer of 1980, Shuman obtained a moratorium on the payment of interest on this loan. One very small supplier was insisting on cash payments for his deliveries to Shuman's salon. Shuman owed some $20,000 of back Federal income taxes, which he was paying by agreement with the Internal Revenue Service, at the rate of $500 each month. His property was subject to a $3,900 tax lien. His rent was not paid promptly nor were small bank loans. There was evidence that his business was for sale. Shuman appears to have disclosed his debts frankly when asked about them by the police. Shuman could have been found to have been separated from his wife and paying her $100 per week. He had lived with a "girlfriend" after November, 1980. She was with him on the night of the fire. A woman, later his partner, described Shuman as "an artist and not a businessman."

(h) Shuman was making substantial sums from representing various firms for giving hairdressing demonstrations, but the business had been hurt when Shuman had been injured in the 1980 motorcycle accident. He had the prospect of some contribution to the business by the woman with whom, after the fire, he had gone into a hairdressing "partnership." Nevertheless, in a series of letters to the Springfield bank, written in late 1980 and early 1981, he had sought to renegotiate and increase his S.B.A. guaranteed loan by representing his business as being in a very difficult situation. Shuman admitted that these letters contained misrepresen-

tations of his financial condition. The aggregate evidence could be viewed by a rational trier of the facts, here an experienced trial judge, as amounting to proof that Shuman would gain benefit from collecting the insurance proceeds of a total loss. He then would have been able to pay off his S.B.A. loan and his back tax indebtedness, thus avoiding interest and possible tax penalties. He presumably could move into other less elaborate quarters and still operate a similar enterprise.

The evidence was not as conclusive in all respects and on particular issues as in some other cases involving proof of responsibility for an incendiary fire. See e.g., *Commonwealth* v. *Bader,* 285 Mass. 574, 576-577 (1934); *Richardson* v. *Travelers Fire Ins. Co.,* 288 Mass. 391, 396-397 (1934); *Commonwealth* v. *Reynolds,* 338 Mass. 130, 133-134 (1958); *Commonwealth* v. *Rhoades,* 379 Mass. 810, 812-815 (1980); *Commonwealth* v. *Niziolek,* 380 Mass. 513, 515-517 (1980); *Commonwealth* v. *Lamattina,* 2 Mass. App. Ct. 203, 205-207 (1974); *Commonwealth* v. *Walter,* 10 Mass. App. Ct. 255, 257-261 (1980); *Commonwealth* v. *Mathews,* 10 Mass. App. Ct. 888, 889 (1980); *Commonwealth* v. *Ward,* 14 Mass. App. Ct. 37, 38-42 (1982). Shuman was not the last person shown by the prosecution to have been on the locus before the fire. Cf. *Commonwealth* v. *Walter,* 10 Mass. App. Ct. at 260. No direct evidence placed him in the neighborhood of the locus just before the fire. He and his "girlfriend" claimed to have been at various Springfield bars from the early evening of the night of the fire until 2 A.M. the next morning. The judge could have found it difficult to believe that Shuman (notified of the fire early in the morning by telephone) would not normally have gone at once to the scene. He, however, was not shown to have lied to investigators about his finances. Cf. *Commonwealth* v. *Ward,* 14 Mass. App. Ct. at 41. Shuman's statements concerning burning the locus may not have been as definite as those in *Commonwealth* v. *Lamattina,* 2 Mass. App. Ct. at 204-207, but (if believed to have been made seriously) they could be viewed as showing that Shuman was contemplating

a fire. Compare *Commonwealth* v. *Wood*, 384 Mass. 641, 643-645 (1981).

The evidence does not show Shuman to have had exclusive access to the third floor of the locus. He possessed, however, one of a limited number of keys to the front door of the locus and to the second floor. The one unlocked window on the third floor could have had its safety block pried off only from the inside. The quantity of gasoline used as an accelerant would have required a substantial container perhaps not easily carried up a shaky fire escape even at night without being observed. That Shuman's master alarm control was in an "off" position was unusual. He had one of the few keys to that control, which, of course, could have been turned off at any time by him or by another. Shuman, in a somewhat stringent financial condition, had an obvious motive to collect insurance. His insurance was ample and perhaps somewhat excessive. It was about to expire. His denials involved questions of his credibility which was badly shaken by his admitted misrepresentations in trying to renegotiate his S.B.A. guaranteed loans. Although no one of the "circumstances . . . alone" might have been "enough to convict" him, they "combine to form a fabric of proof . . . sufficient to warrant the . . . [judge's] finding beyond a reasonable doubt." See *Commonwealth* v. *Rojas*, 388 Mass. 626, 629-630 (1983). The trial judge heard and saw the witnesses. Shuman himself gave extended testimony. The judge's appraisal of all the testimony is not lightly to be disregarded. See *Commonwealth* v. *Schnopps*, 390 Mass. 722, 726, 728 (1984).

2. Although the insurance policy was not placed in evidence, there was ample testimony of the insurance upon Shuman's interest in the locus and its fixtures and contents from an employee of the insurer, admitted without objection. There was no subsequent motion to strike that testimony. The witness described the policy, its face amount, scope of coverage, and expiration date. Shuman himself testified that he made claim under his insurance for water damage. His own insurance broker testified to its existence. The failure to object to the testimony as hearsay when it was

offered precludes any consideration now of its admissibility. *Commonwealth* v. *Gallo,* 6 Mass. App. Ct. 650, 651-652 (1978). See Liacos, Handbook of Massachusetts Evidence, 71, 74-75 (5th ed. 1981 & Supp. 1983). See also *Commonwealth* v. *Reynolds,* 338 Mass. 130, 134-136 (1958). Compare *Commonwealth* v. *Cooper,* 264 Mass. 368, 374 (1928). Cases like *Sinclair* v. *Director of Div. of Employment Sec.,* 331 Mass. 101, 103-104 (1954), and *United States* v. *Krumsiek,* 111 F.2d 74, 77 (1st Cir. 1940), cited in Hughes, Evidence § 452, at 589 n.24 (1961 & Supp. 1981), relating to review of administrative decisions, have no relevance in the circumstances here shown.

3. Shuman sought a new trial, among other reasons, to introduce evidence of a polygraph test administered by a private examiner. The test purported to show that Shuman was truthful in denying that he set or caused the fire at the locus. The judge denied the motion for a new trial and also a motion to consider the polygraph test, in part because "the test was not taken in accordance with the guidelines set out in *Commonwealth* v. *A Juvenile,*" 365 Mass. 421, 430-433 (1974). See discussion of this case in Liacos, Handbook of Massachusetts Evidence at 162-163, *supra* and Supp. 1983 at 47-48. In *Commonwealth* v. *Vitello,* 376 Mass. 426, 453-457 (1978), it was held that polygraph evidence might be admitted in some circumstances upon the issue of a defendant's credibility, but (at 450-453) not as affirmative evidence concerning guilt. On a motion for a new trial, evidence of a type merely tending to impeach or to corroborate credibility of a witness ordinarily will not be the basis for ordering a new trial. See *Commonwealth* v. *Cassesso,* 360 Mass. 570, 575-576 (1971). The judge was not required to grant the new trial because of the polygraph evidence. See *Commonwealth* v. *Markham,* 10 Mass. App. Ct. 651, 653-655 (1980). Here the trial judge was the trier of the facts. He saw the polygraph result and was obviously in a position to know whether that evidence might have influenced him to reach a different result.

4.  Shuman contends that he cannot be convicted of, and sentenced for, arson under G. L. c. 266, § 2,[3] and also of and for arson with intent to defraud an insurance company under c. 266, § 10,[4] on the ground that such convictions are duplicitous.  In *Commonwealth* v. *Crocker*, 384 Mass. 353, 357-358 (1981), it was said, with full citation of the authorities, "that to determine whether a defendant may be convicted of two statutory offenses arising from a single incident, 'the long-prevailing test in this Commonwealth is whether each crime requires proof of an additional fact that the other does not. . . . If so, neither crime is a lesser-included offense of the other, and convictions on both are deemed to have been authorized by the Legislature and hence not duplicitous.' *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981).  In the context of multiple offenses prosecuted at a single criminal proceeding, as is the case here, we have generally adhered to the 'required evidence' rule of *Morey* [v. *Commonwealth*, 108 Mass. 433 (1871)], by examining the elements of the statutory offenses charged to determine whether each offense requires proof of a different fact" (footnotes and certain citations omitted).  In various cases, charges under § 2 and § 10, arising out of a single

---

[3] Section 2, as appearing in St. 1948, c. 43, § 2, reads in part:

"Whoever *wilfully and maliciously* sets fire to, *burns*, or causes to be burned, or whoever aids, counsels or procures the burning of . . . any building or structure or contents thereof, not included or described in the preceding section [referring essentially to dwellings and residential buildings], whether the same is the property of himself or of another and whether occupied, unoccupied or vacant, shall be punished by imprisonment in the state prison for not more than ten years, or by imprisonment in a jail or house of correction for not more than two and one half years" (emphasis supplied).

[4] Section 10, as appearing in St. 1932, c. 192, § 7, reads:

"Whoever, *wilfully and with intent to defraud or injure the insurer*, sets fire to, or attempts to set fire to, or whoever causes to be burned, or whoever aids, counsels or procures the burning of, a building, or any goods, wares, merchandise or other chattels, belonging to himself or another, and *which are at the time insured against loss or damage by fire*, shall be punished by imprisonment in the state prison for not more than five years or in a jail or house of correction for not more than two and one half years" (emphasis supplied).

incident, have been separately charged and combined for trial. See, e.g., *Commonwealth* v. *Walter,* 10 Mass. App. Ct. at 256; *Commonwealth* v. *Beckman,* 14 Mass. App. Ct. 963 (1982). See also *Commonwealth* v. *Niziolek,* 380 Mass. at 526-529 & n.5 (prosecution under § 1 and § 10); *Commonwealth* v. *Ward,* 14 Mass. App. Ct. at 38 (same). The trial judge thought (a) that the essential elements of § 2 were set out in *Commonwealth* v. *Lamothe,* 343 Mass. 417 (1961), and (b) that *Commonwealth* v. *Cooper,* 264 Mass. 368 (1928), stated the different essential elements of § 10. For that reason, he ruled that the two sections were not duplicitous. Assuming that c. 266, § 5A (discussed in the *Lamothe* case, *supra*), involved the same essential elements as § 2, it is hard to perceive that a prosecution under § 2 requires proof of any element not required to be proved with respect to a criminal charge under § 10, unless it be "malice". Malice, however, in the sense in which it is used in § 2, may be inferred from proof of the intentional burning of insured property. See the *Niziolek* case, 380 Mass. at 526-529, and the *Lamothe* case, 343 Mass. at 420, where malice with respect to arson-type offenses is described as "that malice which 'characterizes all acts done with an evil disposition, a wrong and unlawful . . . purpose; the wilful doing of an injurious act without lawful excuse.'" See also *Commonwealth* v. *Mehales,* 284 Mass. 412, 415 (1933), where Rugg, C.J., pointed out that a defendant's "intent . . . to set the fire for the purpose of enabling the owner to collect insurance" constituted "malice in law against the insurer."[5] We conclude that § 2, although it permits a more

_____

[5] See the discussion in Nolan, Criminal Law §§ 424-426 (1976 & Supp. 1983); Perkins, Criminal Law 216-230 (2d ed. 1969); Model Penal Code, § 220.1 (Official Code 1980); Smith, Criminal Practice and Procedure §§ 1056-1058, 1320 (2d ed. 1983). Nothing in these discussions suggests that a statute like § 2 requires proof of any element not necessarily or inferentially established by proof of the essential elements of a statute like § 10. We perceive no such suggestion in the *Niziolek* case, 380 Mass. at 526, or in the *Crocker* case, 384 Mass. at 361 (each relied upon by the Commonwealth in its inadequate brief on the issue whether the convictions under § 2 and § 10 were duplicitous). See *Cepulonis* v. *Commonwealth,* 384 Mass. 495, 500-501 (1981).

severe punishment than does § 10, is a lesser-included of-
fense within § 10, and that, at least upon the record before
us, one of the two convictions cannot stand.

The trial judge upon the conviction under § 2 imposed a
sentence of incarceration for two years in a house of correc-
tion. Under § 10, he imposed a more severe sentence to
M.C.I. Walpole for not more than five years nor less than
three years, *suspended,* with probation for three years from
and after the completion of the sentence under § 2. These
sentences doubtless were imposed because the trial judge
thought the two convictions were not duplicitous. We do
not attempt to resolve the confusion caused by these sen-
tences.

We recognize, of course, the principle stated in *Common-
wealth* v. *Jones,* 382 Mass. at 395, that when "consecutive
sentences on duplicitous charges have been imposed, the
remedy ordered . . . has been to vacate both the conviction
and sentence on the lesser-included offense, and to affirm
that on the more serious offense." It may be that, because
the Legislature has permitted a maximum sentence under
§ 2 greater than that allowed under § 10, the former should
be regarded as the more serious offense. Nevertheless, in
*Kuklis* v. *Commonwealth,* 361 Mass. 302, 309 (1972), the
Supreme Judicial Court, in a somewhat comparable situa-
tion, recognized that "[a]ny one of the three judgments . . .
[there considered could] properly be affirmed" (emphasis
supplied). We, of course, could decide ourselves that the
*Jones* practice should be followed. To do so, if the more
serious offense is the more inclusive offense, would leave
Shuman subject to a suspended sentence to M.C.I. Walpole
plus probation, a sentence which involves no necessary in-
carceration. On the other hand, the sentence under § 2 in-
volves incarceration. We think it more appropriate to leave
the matter to the trial judge, by an application of the *Kuklis*
principle. He, with his more intimate knowledge of Shu-
man's conduct and the general situation (and with oppor-
tunity to consider Shuman's conduct during the period in
which the sentences have been stayed pending appeal), may

decide which disposition is the more appropriate, viz., that
which he imposed under § 2 or that imposed under § 10. He
may cause an entry to be made on the docket of the case on
which the sentence is to be executed, "Judgment affirmed."
The other finding of guilty will be set aside and the indict-
ment dismissed. The denial of the motion for a new trial is
affirmed.

*So ordered.*