## COMMONWEALTH *vs.* JOHN J. HUNTER.

Norfolk. March 19, 1984. — June 8, 1984.

Present: BROWN, DREBEN, & WARNER, JJ.

*Burning of Property. Practice, Criminal,* New trial, Request by jury.

At the trial of a defendant charged with attempted arson of insured property with the intent to defraud the insurer, where evidence permitted findings by the jury that an attempt was made to release gas into that portion of a building occupied by the defendant's business; that the premises, to which the defendant had access, had been entered without force and the burglar alarm system, which the defendant had the means to deactivate, had been deactivated; that the defendant was seen with an individual who possessed tools which could have been used to obtain entry into the area of the building in which the source of the gas leak was found; and that the defendant had been experiencing financial difficulties and had insured his business amply, under a policy of insurance which was about to be cancelled for nonpayment of premium, the jury were warranted in concluding beyond a reasonable doubt that the defendant was guilty of the crime charged. [218-224]

Upon review of all the evidence at the trial of a defendant charged with attempted arson of insured property with the intent to defraud the insurer, this court concluded that the judge did not abuse his discretion in denying the defendant's motion for a new trial. [224]

At a criminal trial, no abuse of discretion appeared from the judge's refusal to furnish the jury with a transcript of the testimony of one of the witnesses for use during their deliberations. [224]

INDICTMENTS found and returned in the Superior Court Department on July 20, 1981.

The cases were tried before *Dimond*, J.

*Willie J. Davis* for the defendant.

*Linda G. Katz*, Assistant Attorney General, for the Commonwealth.

WARNER, J. After a jury trial in the Superior Court, guilty verdicts were returned against the defendant on indictments

charging attempted arson of insured property with the intent to defraud the insurer (G. L. c. 266, § 10) and attempted arson (G. L. c. 266, § 5A). The defendant was sentenced to two and one-half years in a house of correction on the first charge and the simple attempted arson indictment was dismissed on the ground that the verdicts were duplicitous. See *Commonwealth* v. *Shuman,* 17 Mass. App. Ct. 441, 449-451 (1984). The defendant appeals from the denial of a motion for a required finding of not guilty after discharge of the jury and the denial of a motion for a new trial, and claims error in the denial of a jury request for a transcript of the testimony of a witness.

1.  The defendant presented motions for required findings of not guilty at the close of the Commonwealth's case, at the close of all the evidence and after the discharge of the jury; each motion was denied. We need only "consider the evidence introduced up to the time the Commonwealth rested its case." *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976).[1] "The sole question raised by the motions is whether 'there was sufficient evidence of the defendant's guilt to warrant the submission of the cases to a jury.'" *Commonwealth* v. *Kelley, supra,* quoting from *Commonwealth* v. *Altenhaus,* 317 Mass. 270, 271 (1944). "For the purpose of answering this basic question we must consider and determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged. . . ." *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975). *Commonwealth* v. *Kelley, supra* at 150 and n.1. *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-677 (1979). "Additionally, the evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Latimore, supra* at 677, quoting from *Commonwealth* v. *Cooper,* 264 Mass. 368, 373 (1928). "The inferences

---

[1] The Commonwealth's case did not deteriorate between the time the Commonwealth rested and the close of all the evidence. *Commonwealth* v. *Kelley, supra* at 150, n.1.

need not be inescapable or necessary, so long as they are reasonable, possible and not unwarranted because too remote. Convictions may rest entirely or mainly on circumstantial evidence but 'no essential element of the crime may rest in surmise, conjecture, or guesswork'" (citations omitted). *Commonwealth* v. *Walter,* 10 Mass. App. Ct. 255, 257 (1980), quoting from *Commonwealth* v. *Kelley,* 359 Mass. 77, 88 (1971). "[I]t is not necessary [that the Commonwealth] prove that no one other than the accused could have performed the act. That another might have had such an opportunity goes only to the weight of the evidence, which is a matter for the jury." *Commonwealth* v. *Casale,* 381 Mass. 167, 175-176 (1980).

The evidence most favorable to the Commonwealth was as follows. The building at 67-79 Parkingway, Quincy, was a two-story commercial building with a basement. It was occupied by several tenants, including the South Shore Mental Health Center (South Shore) (which sublet space to two other mental health organizations) and LeDisco, Inc., a Massachusetts corporation wholly owned by the defendant, which operated a discotheque, lounge and restaurant known as the California. South Shore occupied the entire second floor and part of the first floor and basement. California occupied portions of the first floor and basement, where it had an office and liquor storage room. South Shore used its basement area for a patient record storage room, a room for janitorial and computer supplies and a playroom. South Shore's basement is immediately below the main premises of California. California's storage room was adjacent to South Shore's playroom, and there was a half-door located in a common wall. On the California side of the door were two slide-bolt locks near the top and bottom. Between the locks was an opening for a doorknob. On the South Shore side was a single slide-bolt lock located above the doorknob hole. The locks on both sides of the half-door were normally fastened, and a piece of paper was stuffed inside the doorknob hole. California had access to its portion of the basement by way of a stairway from its main premises. South Shore's portion of the basement was reached by a stairway from a vestibule outside its main premises; the door leading to this stairway was kept locked at all times.

One Francis Cardoza, an employee of one of the sublessees of South Shore, arrived at work at approximately 7:30 A.M. on January 28, 1981, and detected an odor of natural gas. Investigation by Cardoza and others, including firefighters and an arson investigator, revealed the following. One of two locks, a dead-bolt, on the door leading to the stairway to the basement portion of South Shore's premises was unlocked; both had been locked on the previous afternoon. Five persons had access to the keys to the locks on these doors. It was possible to open the door from the basement side without a key even if the door were fully locked. The stairway lights were on, and the previously locked door to the patients' records room had been "jimmied" open with a screwdriver or like instrument. In the playroom there were two lit candles, one on the floor and one wedged between two platform boards. The slide-bolt lock on the South Shore side of the half-door was in an open position, and the two such locks on the California side were in the closed position. The paper which was normally stuffed in the doorknob hole to obstruct vision was missing. California's kitchen stove pilot light was out and the jets turned on, and there was an odor of natural gas in the area. The source of the gas leak was a pipe in the records room of South Shore which led vertically to California's kitchen stove. A cap on this pipe had been removed; the cap had wrench marks on its exterior surface.

It would have taken about four and one-half hours for sufficient gas to escape into South Shore's basement to cause an explosion. Such an explosion would have sufficient force to collapse the walls, ceilings and roof of the building. Between 12 P.M. on January 27 and 2 A.M. on January 28, the assistant manager of California secured its premises, including the basement area. After determining that no one remained on the premises, he activated a burglar alarm system, locked all doors and left.[2] No alarm was sounded on January 27 or 28.

Shortly after 8:30 A.M. on January 28, one James Ahearn, who was investigating the source of the gas leak, encountered

---

[2] There was conflicting evidence that the defendant secured the premises and set the alarm system at 12:15 A.M. Nothing, however, turns on the jury's possible resolution of this conflict.

the defendant and one Arthur Ashton outside the building. Ashton had a cannister of tools containing screwdrivers and "stuff like that." The defendant identified himself as the owner of California and admitted Ahearn to California's premises. Ahearn, in search of the gas leak, went into the kitchen and basement areas; the defendant accompanied him and showed him the location of the gas meter in the basement.

The California is the only tenant in the building serviced by gas. In 1979 there were extensive renovations to California's premises; the main premises were gutted, and substantial work was done in the basement. Ashton, an electrician, was present during the renovations. The defendant is also an electrician.

The defendant was the sole officer, director and stockholder of LeDisco, Inc. In 1979, LeDisco obtained a $35,000 loan from the United States Trust Co. (UST) which was to be repaid in one year and was secured by all of the assets of LeDisco, including a liquor license, and a personal guarantee of the defendant, as well as a second mortgage on real estate owned by him. In addition, the defendant submitted to UST his resignation as officer and director of LeDisco, "effective when accepted." In May of 1980 the payments were two months in arrears, and the loan was rewritten for a two-year period at a higher rate of interest. This loan was guaranteed by the defendant and his wife. The payments — in an amount a little more than half of those due on the original loan — were consistently late. The October, 1980, payment was not received until December 8, 1980; as of January 28, 1981, the November and December, 1980, and the January, 1981, payments had not been made.

In the last five months of 1980, LeDisco was consistently late in making rent payments. In December, 1980, the lessor sent a default notice threatening termination of the lease. The checks submitted by LeDisco in satisfaction of arrearages were returned for insufficient funds. On January 5, 1981, the defendant delivered $7,500 in cash to the lessor in payment of the rent for November and December, 1980, and January, 1981.

In May, 1979, in connection with renovations to California, the defendant executed a note for a loan of $27,000. In addition,

about $120,000 in cash and materials were advanced by the provider of the loan, in expectation of the acquisition of an ownership interest in LeDisco. No payments had been made on the note or an account of any of the advances as of January 28, 1981, nor had any ownership interest been transferred.

LeDisco regularly appeared on a list of delinquent credit accounts (failure to pay alcoholic beverage suppliers within sixty days of delivery) of the Alcoholic Beverages Control Commission from January 29, 1981, through March 28, 1981, and was delinquent during this period on as many as six accounts. As a consequence, LeDisco was required to pay cash for all purchases until the delinquent accounts were paid. The severity of LeDisco's financial plight is shown by the fact that, from June, 1980, through January, 1981, 127 of its checks totalling $60,373.19 were returned for insufficient funds.

Prior to opening California in September, 1979, LeDisco obtained a fire insurance policy in the amount of $200,000. In January, 1980, policy coverage was reduced to $100,000 because of LeDisco's inability to pay premiums and to avoid cancellation. A subsequent carrier cancelled the policy in July, 1980 and LeDisco then obtained a policy with coverage in the amount of $462,000. The down payment on this policy premium was not paid until about six months after the effective date (July 23, 1980). Payments on the balance of the premium to a premium financing company were consistently late; a notice of intent to cancel was sent in January, 1981; a check for the December, 1980, payment was returned for insufficient funds on January 28, 1981; and on that date both the December, 1980, and January, 1981, payments were overdue.

In November or December of 1980, the defendant engaged a broker to sell his interest in LeDisco. The broker advised the defendant that the business was worth no more than $200,000; the defendant wanted $325,000. In December, 1980, an offer of $200,000 with a down payment of $75,000 was rejected by the defendant because the down payment was not satisfactory. On February 5, 1981, the defendant entered into an agreement of sale to two individuals, one of whom was the manager of California at the time. The sale price was $125,000,

less certain obligations which totalled about $90,000. On consummation of the sale, $25,000 not included in the schedule of obligations was paid on account of the loans made to LeDisco in 1979 for renovations to California.

The defendant concedes that there was an arson attempt. The jury were warranted in finding the following: the defendant had access to California on the morning of January 28, 1981, and the means to deactivate the burglar alarm system; whoever attempted the arson deactivated the alarm system and entered California without force; an attempt was made to release gas in California's premises from the kitchen stove; entry to South Shore's basement was through the half-door from California's basement and egress was in the same manner; the forced entry to South Shore's records room could have been accomplished with the use of tools such as Ashton was carrying when observed with the defendant outside the building; although endangering the whole building, the primary target of the arson attempt was California; the defendant was particularly familiar with the gas distribution system supplying California; the defendant was experiencing serious financial difficulties and needed money; the defendant would derive substantial financial benefit from a fire or explosion on the premises; the premises were overinsured; and the insurance was about to be cancelled for nonpayment of premium. The jury were not required to find, as the defendant suggests, that entry to and egress from South Shore's basement were through South Shore's door and stairway.

The case is close and the evidence may not be as conclusive as in other cases involving similar issues. See *Commonwealth* v. *Shuman,* 17 Mass. App. Ct. 441, 446 (1984), and cases cited. Compare *Commonwealth* v. *Ianelli,* 17 Mass. App. Ct. 1011, 1012 (1984). We think, however, that the evidence and the reasonable and possible inferences were sufficient to permit the jury to find the essential elements of the crime of attempted arson of insured property with the intent to defraud the insurer proved beyond a reasonable doubt. "[The] circumstances, no one of which alone would be enough to convict the defendant, combine to form a fabric of proof that was sufficient to warrant

the jury's finding beyond a reasonable doubt that the defendant was [guilty of the crime charged]." *Commonwealth* v. *Rojas,* 388 Mass. 626, 630 (1983). There was no error in the denial of the motions for a required finding of not guilty.

2. The defendant's motion for a new trial was on the ground that the verdict was against the weight of the evidence. The motion was, therefore, "addressed to the discretion of the judge, and his action in denying it must stand unless there was a clear abuse of discretion." *Commonwealth* v. *Smith,* 357 Mass. 168, 181 (1970). *Commonwealth* v. *Patterson,* 4 Mass. App. Ct. 70, 78 (1976). See *Commonwealth* v. *Woods,* 382 Mass. 1, 8 (1980). We have reviewed all of the evidence and find no such abuse of discretion.

3. There was no abuse of discretion in the denial of the jury's request, during deliberations, for a transcript of the testimony of Ahearn. Such a request calls for the cautious exercise of discretion. *Commonwealth* v. *Mandeville,* 386 Mass. 393, 405 (1982). *Commonwealth* v. *Bianco,* 388 Mass. 358, 370 (1983). *Commonwealth* v. *Fitzpatrick, ante* 106, 108 (1984). The judge carefully considered the matter, allowed counsel to be heard and noted that granting the jury's request might unduly emphasize Ahearn's testimony as to disputed facts. "Leaving the jury to resort to their collective memories was, in the circumstances, a correct exercise of discretion." *Commonwealth* v. *Fitzpatrick, supra* at 109.

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*