COMMONWEALTH vs. JOHN L. RUDDOCK.

No. 86-1281.

Hampshire. April 30, 1987. — March 23, 1988.

Present: GREANEY, C.J., PERRETTA, & WARNER, JJ.

*Destruction of Property. Wanton or Reckless Conduct. Selective Prosecution.*

Evidence at a criminal trial that the defendant jumped over the front of a parked automobile was sufficient to warrant a finding beyond a reasonable doubt that his conduct was wanton or reckless in that it entailed a likelihood of substantial harm to the vehicle, with the result that the defendant was not entitled to a required finding of not guilty on a complaint under G. L. c. 266, § 127, for causing damage to the hood of the car with his foot as he jumped over it. [512-514]
No evidence in the record of a criminal prosecution for violation of G. L. c. 266, § 127, supported the defendant's contention that the complaint was brought in retaliation for his exercise of his right of free speech. [514]

COMPLAINT received and sworn to in the Amherst Division of the District Court Department on May 8, 1985.

On appeal to the jury session the case was tried by *Salvatore A. Polito, J.*

*Mark Eckstein* for the defendant.

*Charles K. Stephenson,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. On May 1, 1985, there was an anti-apartheid student demonstration at the University of Massachusetts, Amherst. While participating in the demonstration, the defendant damaged a 1984 Plymouth Turismo automobile which belonged to an officer in the university police department. About a week after the incident, another university officer brought a complaint against the defendant under G. L. c. 266, § 127, as

appearing in St. 1982, c. 229, § 2,[1] charging that he caused malicious injury to the car. After a bench trial, the defendant was found not guilty on that charge but guilty of the lesser offense of wanton injury to the car. The defendant then claimed a trial by jury which resulted in a guilty verdict. On appeal, the defendant makes two claims: (1) that he was entitled to a required finding of not guilty, as the Commonwealth failed to meet its burden of proving that he caused injury to the car by reason of wanton conduct; and (2) that the complaint should have been dismissed because it was brought in retaliation for his exercise of his right of free speech. We affirm.

I. *The Evidence.*

As presented by the Commonwealth, the evidence begins with student demonstrators in front of and in a building housing the office of the university treasurer. They were demanding divestiture of university holdings and investments in South Africa. The university police had difficulty in clearing the building and dispersing the demonstrators. A final warning was given: leave or be subject to arrest for trespass. The demonstrators refused to move and continued their organized protests. Those facts were recited by Philip Cavanaugh, a police officer at the university.

---

[1] "Whoever destroys or injures the personal property, dwelling house or building of another in any manner or by any means not particularly described or mentioned in this chapter shall, [1] if such destruction or injury is wilful and malicious, be punished by imprisonment in the state prison for not more than ten years or by a fine of three thousand dollars or three times the value of the property so destroyed or injured, whichever is greater and imprisonment in jail for not more than two and one-half years; or [2] if such destruction or injury is wanton, shall be punished by a fine of fifteen hundred dollars or three times the value of the property so destroyed or injured, whichever is greater, or by imprisonment for not more than two and one-half years; if the value of the property so destroyed or injured is not alleged to exceed one hundred dollars, the punishment shall be by a fine of three times the value of the damage or injury to such property or by imprisonment for not more than two and one-half months; provided, however, that where a fine is levied pursuant to the value of the property destroyed or injured, the court shall, after conviction, conduct an evidentiary hearing to ascertain the value of the property so destroyed or injured." (The numbers in brackets have been inserted for purposes of references to the statute made throughout this opinion.)

Cavanaugh described how the atmosphere intensified when the university police began to arrest and handcuff students and to place them on a bus. The bus had been parked alongside the building in the event it should become necessary, as it did, to transport demonstrators to the campus police station. Once the bus was full, the driver (also an officer) began the trip to the police station. However, progress was impeded by the remaining demonstrators. Many of them sat in the path of the bus, others threw themselves at it, and one even clung tenaciously to the side-view mirror. At this time, Cavanaugh saw the defendant using a megaphone to encourage the demonstrators in their attempts to prevent the bus from moving.

As the officers cleared the path, student by student, the driver inched forward. Students removed from the path were quickly replaced by demonstrators who had yet to be restrained. Nonetheless, the driver was able to make some progress. When it became apparent that the bus was gaining ground, albeit slowly, the demonstration escalated and some officers were assaulted.

Seeing the defendant with his megaphone, Cavanaugh went over to him and asked that he urge the demonstrators to allow the bus to proceed to the police station so that the students on the bus could alight. The defendant replied, according to Cavanaugh, "I can't help you." Cavanaugh saw no one else with a megaphone.

Faced with this situation, Cavanaugh returned to the bus and told the driver to turn around and go back to his starting point. It was Cavanaugh's plan that this maneuver would "dissipate some of the demonstrators" so that the officers could get the bus into the parking lot at the police station.

Initially the plan met with success. Cavanaugh went ahead to the station to await the bus. The driver was nearly to the parking lot when the demonstrators once again placed themselves in the path of the bus. With forward progress thus blocked, the driver put the bus into reverse and began to back into a driveway to the lot. As Cavanaugh watched, he could hear a voice being broadcast over a megaphone to the demonstrators. The speaker was encouraging their efforts and

advising them to remember that the police would be held accountable for their actions.

Several things next happened, but the sequence is not entirely clear from the transcript. Whoever was using the megaphone began to shout that the bus was going to blow up, that gasoline was "sloshing from the bus." When Cavanaugh turned, he saw the defendant, with a megaphone, running across the parking lot towards the bus. The lot was crowded with parked cars. The defendant ran between them until he reached the last one of a row. He jumped over that car, described by Cavanaugh as a "compact car," and as he did so his foot landed on the back corner of the hood on the driver's side. He continued towards the bus and past Cavanaugh, who grabbed him and said: "That was uncalled for. If someone did that to your car, you would raise hell."

There is no dispute that gas spilled from the capless tank of the bus when it experienced any sideways motion. Cavanaugh testified that when he saw the gas spilling, he recognized the potential danger and ordered officers to stand along the side of the bus as the occupants were removed. He testified that, after he gave these orders, he also saw the defendant "stay[ ] with the demonstrators that were trying to block the door of the bus . . . ."

After the bus was emptied and the situation became somewhat calmer, Cavanaugh and another officer went over to the car to look at it closely. Again according to Cavanaugh's testimony, as they were examining the hood, the defendant came up to them and said, "I will apologize for the damage done to that car when the university police apologize for the way that they handled the demonstrators today."

Officer Bromery, the owner of the car, joined the group and asked what was wrong. He looked at the back corner of the hood on the driver's side and saw a dent, four to six inches in circumference, and a scratch, three to four inches in length. He and the defendant exchanged words, the defendant telling him that he had been "concerned about the safety of the students

on the bus,"[2] and Bromery advising the defendant that he should be "concerned about the damage to . . . [the] car and the bill he was going to get." Bromery testified that he did not sign a criminal complaint and that the cost of repairing the hood was $270.

According to the testimony of the repairman, that cost was for labor, parts, and repairs. It took two hours to repair the dent, which the repairman described as "soft" and "minor," and to repaint the hood stripes.

Although the defendant presented evidence, the Commonwealth's case did not deteriorate. We, therefore, consider only the evidence discussed above, and we do so in the light most favorable to the Commonwealth. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976); *Commonwealth* v. *Hunter*, 18 Mass. App. Ct. 217, 218-219 (1984).

II. *Wanton Conduct.*

In order to avoid the danger of transforming a simple trespass to property into a crime, courts narrowly construe statutes imposing criminal sanctions for conduct which results in property damage. Under that portion of § 127 bracketed as [1] at note 1, *supra*, and its antecedents, an injurious act is deemed criminal when it is shown to have been committed with a spirit of cruelty, revenge, or hostility. See *Commonwealth* v. *Walden*, 3 Cush. 558 (1849); *Commonwealth* v. *Williams*, 110 Mass. 401 (1872); *Commonwealth* v. *Hosman*, 257 Mass. 379 (1926); *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437 (1983). See also Nolan, Criminal Law § 427, at 259-260 (1976). As fully explained in *Peruzzi*, *supra* at 440-443, discussing the relevant cases and other authorities therein cited, it is that spirit of cruelty, revenge, or hostility that renders the act "wilful and malicious" and, hence, criminal.

Turning to that portion of § 127 here controlling and bracketed as [2] at note 1, *supra*, we see our task as being to determine what it is that transforms an injurious act into wanton conduct. We are here concerned with a spirit of indifference

---

[2] Although we are dealing with a motion for a required finding of not guilty, we note that the judge instructed the jury on the defenses of accident and necessity.

or recklessness, perhaps even arrogance and insolence, but not cruelty, revenge, or hostility. See *Commonwealth* v. *Byard*, 200 Mass. 175, 177-178 (1908); *Commonwealth* v. *Welansky*, 316 Mass. 383, 398-399 (1944). See also Nolan, *supra* at 260. However, conduct cannot be characterized as wanton or reckless for purposes of criminal liability simply by reason of an indifference to a probable but slight injury.

In the absence of a likelihood of substantial injury, conduct is neither wanton nor reckless for purposes of establishing criminal responsibility. "The words 'wanton' and 'reckless' . . . express a difference in the degree of risk and in the voluntary taking of a risk so marked, as compared with negligence, as to amount substantially and in the eyes of the law to a difference in kind." *Welansky*, *supra* at 399. It is critical to note that whether conduct can be deemed wanton or reckless does not turn on the degree of the injury in fact inflicted. See *Commonwealth* v. *Smith*, 17 Mass. App. Ct. 918, 920 (1983) (a "wanton or reckless actor intends his conduct but not necessarily the resulting harm"). Criminal responsibility is imposed on the basis of the intentional doing of an act with an awareness of the probability that the act will result in substantial damage. See *Commonwealth* v. *Byard*, 200 Mass. at 177-178; *Commonwealth* v. *Welansky*, 316 Mass. at 399; *Commonwealth* v. *Godin*, 374 Mass. 120, 130 (1977), cert. denied, 436 U.S. 917 (1978). That the injury turns out to be minor or insignificant is a matter of luck which is irrelevant to the question of the defendant's conduct.

Applying these principles to the Commonwealth's proof, we think the evidence sufficient to warrant a finding that the defendant's act was wanton or reckless. The evidence most favorable to the Commonwealth shows that the defendant's act was to jump over the front of the car as he ran through the lot with a megaphone in his hand. We think it more than reasonable to infer that by this act the defendant took the risk that he might not clear the car and that were that to happen, all or part of his body and the megaphone would land atop the hood of the compact car. We conclude that the evidence and the inferences which reasonably could be drawn therefrom

were sufficient to permit a rational juror to find beyond a reasonable doubt that the defendant's conduct was wanton or reckless in that his act entailed a likelihood of substantial harm to the car.

III. *Dismissal of the Complaint.*

There is nothing in the record before us that remotely indicates that the defendant was complained against because of the "content of his speech." See *Commonwealth* v. *Franklin*, 376 Mass. 885, 894 (1978). His argument that this claim is supported by the fact that the complaint was not brought until a week after the incident requires no discussion. Cf. *Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315, 318 (1977).

*Judgment affirmed.*