COMMONWEALTH *vs.* CHRISTOS FILIPPIDAKIS.

No. 90-P-354.

Worcester. October 10, 1990. - January 7, 1991.

Present: SMITH, KAPLAN, & GILLERMAN, JJ.

*Constitutional Law*, Assistance of counsel. *Practice, Criminal*, New trial,
Assistance of counsel, Voluntariness of statement. *Attorney at Law*,
Conflict of interest. *Search and Seizure*, Affidavit.

A criminal defendant did not demonstrate that he was denied effective as-
sistance of counsel at his trial by reason of his counsel's alleged con-
flicts of interest [682-684], or his counsel's failure to challenge the ad-
missibility of certain correctly admitted evidence [684-687], or with
respect to his counsel's alleged mishandling of the issue of the volunta-
riness of the defendant's admissions to the police [687].

INDICTMENTS found and returned in the Superior Court
Department on February 12, 1988.

The cases were tried before *James P. Donohue*, J., and a
motion for a new trial was considered by him.

*Conrad W. Fisher* (*Charles K. Stephenson* with him) for
the defendant.

*Sean J. Gallagher*, Assistant District Attorney, for the
Commonwealth.

KAPLAN, J. Convicted on August 31, 1989, of receiving
stolen goods (from a Caldor store) and trafficking in more
than 100 grams of cocaine,[1] the defendant Filippidakis,
through new counsel, moved on February 7, 1990, for a new
trial on the ground that his trial counsel had not afforded

---

[1]The defendant was also found guilty of possession of cocaine with in-
tent to distribute, but this was duplicative of the trafficking conviction and
was dismissed. There was insufficient proof on counts for illegal possession
of a firearm and receiving the same as a stolen article, and required find-
ings of not guilty were made. With the consent of the defendant, a count
for illegal possession of ammunition was placed on file.

him effective assistance. Upon consideration of the trial record and affidavits filed in support of the motion, the trial judge denied the motion with an explanatory memorandum; he did not think an evidentiary hearing was called for. From the order of denial, the defendant takes his appeal. We affirm.

1. *Trial Record.* It becomes useful to outline the evidence at trial. Officers on July 8, 1987, executed search warrants issued the same day for the first and second floors of premises at 90 Providence Street, Worcester, said to be occupied by "the Greek," described as a male, forty to forty-five years old, with blackish hair and beard. The objects of the search were goods stolen from a Caldor store in Westborough, as well as cocaine and drug related items.

Search by State and Westborough police officers yielded many items in each apartment identified as stolen from Caldor. Most of the goods were still in their boxes. The defendant's son-in-law, Konstantinos Panoutsakopoulas, forty years old and bearded, the occupant of the first floor apartment, was arrested and charged with receiving the stolen goods found there. He later, on February 25, 1988, admitted to sufficient facts for a finding of guilty on a count of receiving stolen goods.[2]

State Trooper Thomas Greene, after he had forced his way into the second floor apartment, passed through to the front hallway. There he saw the defendant, an elderly man with gray hair, coming down from the third floor. Upon determining that the defendant lived in the second floor apartment, Greene arrested him on the spot. The defendant was found to have on his person keys to the third floor apartment and a notebook into which was inserted a "cuff sheet" (a tally sheet of drug transactions).

Greene now sought and obtained a search warrant for the third floor apartment, stated to be occupied by the defendant. Found there were additional stolen goods similar to those found on the floors below, as well as 103 grams of co-

---

[2]His case was continued for one year and was then dismissed on payment of $1,000 costs.

caine, a bottle of Inositol (a compound used to "cut" co-caine), two triple beam scales, baggies, a grinder, and $18,902 in cash. A wallet also discovered contained various credit cards in the defendant's name and $3,000 in cash.

The defendant, after Miranda warnings, made a number of statements at the house and subsequently. He said: "It's mine. Everything is mine. I keep it up here" (referring to the third floor apartment), and denied that anyone else was involved with the cocaine. He also admitted to having bought "a couple of ounces" of cocaine "a couple of months ago" when he was sick and in financial straits. He said he was the owner of the building. The occupant of the third floor, he said, was his other son-in-law, Namvar Mansouri. Mansouri was out of the country and had been away for three months.

Such was the substance of the evidence for the Commonwealth.

The defendant, testifying in his own behalf, denied having made any incriminating statements to the police. He said he had been unable to grow a beard since 1987 as a result of treatment by chemotherapy for cancer. He confirmed that he owned the building; also an adjacent pizza parlor. He lived, he said, in the second floor apartment and was arrested there while he was watching TV. He never saw stolen goods in his apartment and knew nothing about cocaine; if he admitted to the police any connection with the drug or goods, it was under police threats that he would not see his absent relatives again.

According to the defendant, the third floor apartment, during the absence of Mansouri and his wife and children, was subleased to one Spiros Athanasiou, and he, the defendant, had not been in that apartment since Mansouri's departure in May, 1987. The credit cards taken were "old."

The daughter Maria Mansouri (wife of Namvar) corroborated that Athanasiou was the resident of the upstairs apartment at the time of the arrests. He was said to be about thirty-five years of age and to have a black beard. The defendant, she said, had no association with him. The notebook belonged to her husband and she had last seen it in the small

office, separate from the apartment, on the third floor. The daughter Arete Panoutsakopoulas (wife of Konstantinos) confirmed that Athanasiou lived on the third floor and identified him as the bearded man in his thirties in a photograph. She had seen no contraband on the second floor.

Konstantinos Panoutsakopoulas took the stand to admit in some detail to having purchased the stolen items found in his apartment. The defendant, he said, was not connected with these goods; Panoutsakopoulas had not seen any stolen goods in the defendant's second floor apartment, nor had he seen any involvement of the defendant with cocaine.

On the foregoing summary of the evidence, the guilty verdicts appear adequately supported in substance. This is not disputed.

2. *New Trial Motion.* Besides argument based on the trial record, the motion tendered essentially the search warrant materials and affidavits from the defendant Filippidakis, his wife, and daughter Arete Panoutsakopoulas. Ineffectiveness of trial counsel was charged in the three respects, (a)-(c) which follow.

(a) *Conflict of interest.* (i) *Panoutsakopoulas.* The first floor resident, Konstantinos Panoutsakopoulas, fits more or less the description of "the Greek" in the identical affidavits supporting the first and second floor warrants. He was thus an alternative suspect to the defendant regarding the stolen goods and cocaine trafficking. The defendant's trial attorney had represented Panoutsakopoulas on the charge of receiving the stolen goods, found on the first floor. That prosecution, however, had been disposed of on February 24, 1989, before Panoutsakopoulas testified in the instant case, and the attorney-client relationship had ended. Thus there was no such "genuine" or per se conflict of interest as can be found "when there is joint representation and 'an attorney cannot use his best efforts to exonerate one defendant for fear of implicating another defendant.' " *Commonwealth* v. *Griffin,* 404 Mass. 372, 375-376 (1989). See, in varying situations, *Commonwealth* v. *Soffen,* 377 Mass. 433, 439-440 (1979); *Commonwealth* v. *Cobb,* 379 Mass. 456, 460-461 (1980);

*Commonwealth* v. *Pires*, 389 Mass. 657, 661-662 (1983). See also *Commonwealth* v. *Smith*, 362 Mass. 782, 784 (1973). Whether Panoutsakopoulas made any communications to the attorney whose suppression could embarrass the attorney's defense efforts in the present case was a matter of fact to be shown or at least suggested beyond mere speculation. See *Commonwealth* v. *Smith*, 362 Mass. at 784; *Commonwealth* v. *Walter*, 19 Mass. App. Ct. 82, 86 (1984), *S.C.*, 396 Mass. 549, 554 (1986). What remained was the possibility of a "tenuous" conflict where divergent interests of those represented by the defense attorney are not immediately evident, but become so through a material defect in trial performance. There is nothing in the record to suggest that the attorney's performance here was adversely influenced by any residual allegiance to Panoutsakopoulas. See *Commonwealth* v. *Davis*, 376 Mass. 777, 783 (1978). We agree with the judge that there was little or nothing to go on. We add that conflict of interest appears hardly plausible where Panoutsakopoulas, putatively "the Greek," took the stand and testified in the defendant's favor.

(ii) *Athanasiou.* Another "tenuous" possibility arose from the fact that the attorney, at the time of the instant trial, was the attorney of record in an unrelated aggravated rape and kidnapping prosecution against Athanasiou.[3] The charge remained unresolved because Athanasiou had defaulted on his bail and apparently fled the country and was beyond reach. It is intimated that it may have been through loyalty to Athanasiou that the attorney failed to call Helen Bilioris, Athanasiou's former girl friend, the alleged victim of the rape. The attorney had indeed named Bilioris in his witness list and opening statement and made some effort to subpoena her, which he abandoned. Bilioris might have been a willing witness against Athanasiou's interest, and conceivably she would corroborate testimony that he occupied the third floor apartment at the time of the arrests, confirm his resemblance

---

[3]The events were alleged to have taken place on August 8-11, 1987, a month after the defendant Filippidakis' arrest and two years before his trial.

to "the Greek," describe his high-spending style hinted at in other testimony, and state, if she knew, what was his source of income. But, without regard to the attorney's conceivable motive in not pressing to call Bilioris, what is predicated as her contribution would be mostly cumulative upon evidence given by others; otherwise it rested in speculation. The defendant, as the moving party for a new trial, presented no circumstantial proof, let alone an affidavit by Bilioris, that showed she "could have added anything to improve the defendant's case." *Commonwealth* v. *Walter*, 396 Mass. at 559. See also *Commonwealth* v. *Edgerly*, 390 Mass. 103, 108 (1983); *Commonwealth* v. *Cote*, 7 Mass. App. Ct. 150, 152 (1979).

(b) *Admission of evidence obtained under search warrants.* The motion for a new trial argues that the attorney's ineffectiveness is shown by his failure to contest the admissibility of the items recovered under the search warrants.

We deal first with the sufficiency of the affidavits supporting the warrants for the first and second floor apartments. These are to be evaluated within the familiar framework of *Aguilar-Spinelli* (*Aguilar* v. *Texas*, 378 U.S. 108 [1964]; *Spinelli* v. *United States*, 393 U.S. 410 [1969]); see *Commonwealth* v. *Upton* (*Upton II*), 394 Mass. 363, 374-375 (1985).

"Basis of knowledge" was sufficiently shown by the affiant Greene's report of the statements of a "confidential" (i.e., known but anonymous) informant, called C-1, as follows. The Greek was currently selling cocaine from the first and second floor apartments. C-1 (a known cocaine user) within the last forty-eight hours had purchased cocaine from the Greek on the second floor (as he or she had done several times in the past at that address). Also within the last forty-eight hours, C-1 had gone to the first and second floor apartments and seen there various pieces of equipment (cameras, lenses, etc.) still in boxes; the Greek, in a conversation with C-1, said he had received the goods from the person who stole them.

Coming to the question of the "veracity" of the informant, the affiant stated that C-1 within the last two years had furnished information to the State police at the Worcester CPAC narcotics section which proved true and accurate, including information that resulted in the arrest on January 17, 1986, of one Pablo Rosa Rivera for possession of heroin with intent to distribute. C-1's assistance in a drug arrest was not enough in itself to establish veracity, as assistance in securing a conviction would be. See *Commonwealth* v. *Rojas*, 403 Mass. 483, 486 (1988). Cf. *Commonwealth* v. *Shea*, 28 Mass. App. Ct. 28, 31 (1989). So also, C-1's admission to engaging in drug transactions, although C-1's identity was known to the police, would not in itself establish veracity, at least in the absence of some indication that the informant would have had a "reasonable fear of prosecution." See *Commonwealth* v. *Melendez*, 407 Mass. 53, 56 (1990).

The deficit in the affidavits is overcome by "corroboration," the affiant's confirmation of further information supplied by C-1. On July 8, evidently before the information was generally known, C-1 told the affiant that Guy Roberge, along with a female named April and a Spanish male named Juan, had been arrested that day at the Tudor Motel for receiving stolen property and were found in possession of numerous cameras stolen from Caldor. The affiant spoke with an officer of the Shrewsbury police department and confirmed that Guy Roberge, April Bandy, and Juan Rivera were so arrested and were found in possession of cameras missing from Caldor which the officer listed. As in *Commonwealth* v. *Alessio*, 377 Mass. 76 (1979), the corroborated information concerned an episode criminal, rather than bland in nature, which was related (perhaps more closely here than in *Alessio*) to the objectives of the warrants.[4] Note the importance attached to the elements of the criminal character

---

[4] In *Alessio*, the informant gave information about two illegal betting operations. The police were able to corroborate the substance of one tip and used this corroboration to satisfy the "veracity" test with respect to the other tip. *Id.* at 80-81.

and the relatedness of the information corroborated in such cases as *Commonwealth* v. *Truax*, 397 Mass. 174, 177-178 (1986); *Commonwealth* v. *Valdez*, 402 Mass. 65, 71 (1988); *Commonwealth* v. *DiStefano*, 22 Mass. App. Ct. 535, 538-540 (1986). Such information, after its verification by the police, supported the affidavit and probable cause in two ways. By the demonstration of its truthfulness, it bore "reflexively" upon an evaluation of the general veracity of the informant. See *Commonwealth* v. *Alessio*, 377 Mass at 81. Contrast *Commonwealth* v. *Upton* (*Upton I*), 390 Mass. 562, 572 (1983), rev'd, 466 U.S. 727 (1984), *S.C.*, 394 Mass. 363 (1985). It also reinforced and confirmed the informant's story taken as a whole, for his or her knowledge of the verified particulars indicated that he or she was intimately acquainted with the theft and its sequelae to the location of the goods at 90 Providence Street. See, e.g., *Commonwealth* v. *Parapar*, 404 Mass. 319, 323 (1989); *Commonwealth* v. *Cast*, 407 Mass. 891, 897-898 (1990).[5]

Officer Greene, in his application for a third warrant to search the third floor, relied on his own experience in apprehending, searching, and talking with the defendant, which provided links to the apartment upstairs. Greene's affidavit refers also to a further communication by the informant, by this time well proved to be trustworthy. The defendant argues that there were contradictions between the earlier and the third affidavits that might have entitled the defendant to

---

[5]The affidavits in the present case resemble, structurally, the affidavits in *Alessio* and *Upton*. In those cases, as here, corroboration of the informant's tip consisted of evidence of criminal activity by third persons, not the defendant. In *Upton*, the evidence was suppressed, in *Alessio* admitted. The informant in *Upton* was anonymous and told in essence merely that a third person's motel room had been "raided," which was true. The anonymous informant in *Alessio* gave information, proven correct, about ongoing criminal activity similar to that charged to the defendant. The facts at bar improved on both cited cases. The informant was known and had given truthful information in the past. He or she now provided specific identification of three individuals very recently involved in criminal activity related to the substance of the defendant's suspected offense and gave details about the circumstances of their arrests. These factors are more than adequate to accredit the informant.

a *Franks* hearing (*Franks* v. *Delaware*, 438 U.S. 154, 155-156 [1978]), but the contention fails.[6]

(c) *Defendant's admissions.* The attorney's handling of the question of the voluntariness of the defendant's admissions is quite perplexing. When the prosecution presented evidence that the defendant's admissions were voluntary, the attorney indicated to the judge that the voluntariness of the statements elicited was not in contention. Yet in cross-examining an officer testifying to the defendant's statements, the attorney put questions about threats made to the defendant. When the defendant testified to threats, the attorney expressed surprise.

The attorney did not seek a voir dire. However, after it became apparent from the defendant's testimony that voluntariness was at issue, the judge, reflecting our "humane practice," *cf. Commonwealth* v. *Tavares*, 385 Mass. 140, 149 (1982), made a finding upon all the evidence before him that the defendant, despite his difficulties with the English language, had been made aware of the substance of the Miranda warnings and had made his statements without coercion. The question of voluntariness was also put to the jury under the judge's instructions. Examining the papers supporting the new trial motion, we find on the matter of voluntariness only the defendant's affidavit in which he largely reiterated his trial testimony, and an affidavit by his wife describing to much the same effect the circumstances of his arrest. She also says she told the attorney about all this.

On the whole, we do not think there was enough here to justify revisiting the question of coerced admissions.

---

[6]A *Franks* hearing will be denied unless "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit . . . . " *Commonwealth* v. *Signorine*, 404 Mass. 400, 406 n.4 (1989) (quoting from *Franks*, 438 U.S. at 155-156). Here the defendant points to alleged inconsistencies in the statements attributed to the informant, but the later statement appears rather to amplify the earlier, and there is no material basis for impugning the good faith of the affiant.

*Conclusion.* Out of abundant caution, other attorneys might have questioned the basis for the warrants and the conditions under which the defendant made his admissions. Conceivably, allowing for fortuities in the course of litigation, the defendant might have gained by those tactics, but on their merits, as the trial judge and this court now see them, the tactics should have, and therefore very probably would have, failed. We take note, also, of a certain feckless-ness or confusion in the attorney's conduct of the defense — his waffling about the voluntariness issue is an example — that does not commend itself. His closing speech to the jury, while making some telling points, rings with a self-indulgent bombast whose effect on an intelligent jury is questionable.

We are to recall, however, that a heavy burden of proof is cast on a defendant who moves for a new trial for ineffective-ness of counsel, see *Commonwealth v. Daigle,* 379 Mass. 541, 544 (1980), and that, by the rule of *Commonwealth v. Saferian,* 366 Mass. 89, 96 (1974), the defendant, to prevail, must not only show that the attorney's behavior fell "measur-ably below that which might be expected from an ordinary fallible lawyer," but also that his conduct "likely deprived the defendant of an otherwise available, substantial ground of defence." See also *Commonwealth v. Adams,* 374 Mass. 722, 727-729 (1978); *Commonwealth v. Rondeau,* 378 Mass. 408, 412 (1979); *Commonwealth v. Doucette,* 391 Mass. 443, 457-458 (1984); *Commonwealth v. Jones,* 15 Mass. App. Ct. 692, 697 (1983). On these points the views of the judge who tried the case are entitled to high respect. See *Commonwealth v. Doucette,* 391 Mass. at 447; *Common-wealth v. Gaeten,* 15 Mass. App. Ct. 524, 532-533 (1983). We conclude, as did the trial judge, that "trial counsel's per-formance exceed[ed] the constitutional minimum required under *Saferian.*"

> *Order denying motion for new trial affirmed.*