Connolly, Thomas E., J.
On August 6, 1993, a Suffolk County grand jury indicted the defendants, Michael Cowels (“Cowels”) and Michael Mims (“Mims”), for murder in the first degree of Belinda Miscioscia (“Miscioscia”). On December 5, 1994, after a seven-day trial, a jury found the defendants guilty of first-degree murder under a theory of extreme atrocity or cruelty. The court sentenced the defendants to life in prison. On June 20, 1997, the Supreme Judicial Court affirmed the defendants’ convictions. See Commonwealth v. Cowels, 425 Mass. 279 (1997). A petition for habeas corpus filed by Mims in the United States District Court for the District of Massachusetts was dismissed, see Mims v. DiPaolo, 98-CV-11203-MEL (D.Mass. Apr. 1, 1999) (Lasker, J.) (unpublished), and this dismissal was affirmed by the United States Court of Appeals for the First Circuit, see Mims v. DiPaolo, 201 F.3d 428, 2000 WL 50373 (1st Cir. 2000) (unpublished).[1]
On July 3, 1998, Cowels filed a pro se Motion for New Trial (Docket no. 62). On May 13, 2004, the New England Innocence Project agreed to review Cowels’s case and subsequently referred it to attorneys at Goodwin Proctor. On December 17, 2004, Cowels filed an assented to motion to stay his pending 1998 motion for new trial so that DNA testing could be performed on certain pieces of evidence (Docket no. 70). The court allowed the motion and granted the stay. On January *348 17, 2007, the court signed an agreed-upon order regarding DNA testing pursuant to which Orchid Cellmark, Inc. (“Cellmark”) would test certain physical evidence (Docket nos. 72 and 73). Cellmark submitted its report on May 23, 2007.
On February 4, 2008, Cowels filed an Amended Motion for New Trial (Docket no. 74) arguing newly discovered evidence and ineffective assistance of counsel entitle him to a new trial.[2] On March 24, 2008, Mims, represented by separate counsel, filed his first Motion for a New Trial (Docket no. 34.1) arguing the same as Cowels. A non-evidentiary hearing was held on July 13, 2010.
BACKGROUND
The facts of this case are set forth in the opinion of the Supreme Judicial Court affirming the convictions of Cowels and Mims. Cowels, 425 Mass. at 280-85. The court will supplement additional facts as necessary.
Robert Salie (“Salie”) testified to the following at trial. At approximately 9:30 p.m., Cowels, Mims, and Miscioscia rang Salie’s buzzer and he let them in (5-47). Cowels was wearing a pair of shorts, a blue T-shirt, and a pair of Converse sneakers (5-49). Mims was wearing a black pair of shorts, a T-shirt, and high-top sneakers (5-49). They smoked a marihuana joint and then Cowels, Mims, and Miscioscia went into the bedroom (5-50). After a period of time, Salie walked into the bedroom and saw Cowels, Mims, and Miscioscia “proceeding to engage in sex” (5-51-52).[3] After twenty to twenty-five minutes, Cowels, Mims, and Miscioscia exited the bedroom, sat down for a few minutes, and then left in Cowels’s car (5-52-53).
At 11:30 p.m., Cowels and Mims rang Salie’s buzzer (5-82). Cowels and Mims went straight to the bathroom (5-82). Salie heard the water running in the sink (5-83). After approximately twenty minutes, Mims exited the bathroom and sat on the couch with a plastic bag in his hands (5-83, 5-86). Then Cowels walked out with a plastic bag with the clothes he had been wearing and a sneaker in it and a Converse sneaker with black trim in his hand (5-83-84,5-146). He was only wearing his underwear (5-84, 5-146). Cowels asked Salie to borrow some clothes (5-84). Cowels showed Salie the sneaker which had a spot of blood on it and said “this is what happens when you fuck with me” and “that if you fuck with me, this is what happens, and you’ll read about it in the papers tomorrow” (5-84-85). Cowels also told Salie that if he said anything, he would get hurt (5-86). Cowels said that Salie would read about how “we killed her” in the papers tomorrow and then winked at Mims and said “she was a fucking pig and got what she deserved” (5-86). Salie gave Cowels a pair of moccasins, a pair of shorts, and a blue T-shirt (5-86). Salie gave Mims a pair of black shorts, a pair of green and gray high-top ski boot sneakers, and a T-shirt (5-87). Before Cowels and Mims left, Mims told Salie to keep his mouth shut and Cowels pointed his finger at Salie’s head and said that Salie would get “fucking hurt” if he said anything (5-87). Cowels and Mims took the plastic bags with them (5-88).
At approximately 1:00 a.m. on June 27, 1993, Cowels and Mims came back to Salie’s apartment and Mims asked if he could sleep over (5-88). They did not have a bag with them (5-88). Cowels and Mims “referred that I’d better keep my mouth shut and also to state that they were there from 1:30 to 2 o’clock” (5-89). Cowels also said that he was going to jail (5-94). Then Cowels left and Mims stayed over on the couch (5-89, 5-91-92).
On July 23, 1993, approximately four weeks after the murder, the police found two “bloody” towels in Salie’s apartment while executing a search warrant (4-85, 4-90).[4]
Richard Polovick (“Polovick”) testified that sometime after the murder, Cowels came to Polovick’s friend’s house to have Polovick look at a fiat tire (4-208). When Cowels opened his truck, Polovick saw a pair of white Converse sneakers in the trunk (4-209). Polovick asked Cowels “if those were the notorious sneakers that people were talking about” (4-210). Cowels responded in the affirmative and then took the sneakers and threw them in the bushes (4-210, 4-212). Polovick led the police to those sneakers (4-217-18).
Robert Sullivan (“Sullivan”), from the State Police Crime Laboratory, testified that he received a pair of sneakers on July 27, 1993 and they were soaking wet (6-27).[5] He performed a preliminary test for the presence of blood on the sneakers (6-27). Specifically, he took a piece of filter paper and rubbed various areas on the sneakers and then applied a solution of or-thotolidine followed by a solution of sodium perborate (6-28).[6] In the presence of blood, a deep blue color develops immediately and Sullivan obtained a positive result on the left sole of one of the sneakers in a recessed area (i.e., an area that would not normally come in contact with the ground) (6-28-29, 6-33). Sullivan dried the sneakers and retested them again obtaining a positive test on the sole of the left sneaker (6-29).
On cross, Sullivan testified that there were other spots on the sneakers: bright red, gray, gray-blue, and red (6-32). Those spots were not blood and he did not determine the nature of those stains (6-32). He examined all surfaces of the left sneaker for the presence of blood (6-32). He saw a red-brown stain on the left sole of the sneaker that was not blood (6-34-36).[7] The substance that tested positive for blood was blood that is non-visible to the naked eye (6-37). Other materials will produce a similar blue color in this preliminary test (i.e., a false positive), but non-blood materials differ in the rate in which the color develops and in the intensity of the color (e.g., vegetables and fruits will give you a slow reaction and a light blue color) (6-37-38, 6-42). There were red or reddish-brown stains on *349 the right sneaker also, but no traces of blood were found (6-38). When dealing with non-visible or occult blood, no testing can determine whether the blood is human or animal or specify how long the blood has been there (6-40).
In support of the motion for new trial, the defendants submitted the following:
The affidavit of Matthew DuPont, Forensics Supervisor at Cellmark, providing that:
Cellmark performed DNA testing on three pieces of evidence: (1) a whitish green towel recovered in a witness’s apartment; (2) a vaginal swab from Miscioscia; and (3) a pair of white Converse sneakers. Specifically, Cellmark was asked to determine if DNA profiles could be obtained from biological material on any of the three items, and if so, to then compare those profiles to DNA profiles of Cowels, Mims, and Miscioscia.
1.Towel
Through DNA testing that was not available in 1993 or 1994 Cellmark determined that the blood on the green towel was not from Cowels, Mims, or Miscioscia, but from an unknown male.
2.Vaginal swab
Through DNA testing that was not available in 1993 or 1994 Cellmark identified Mims as the donor of the sperm and excluded Cowels as the contributor of the sperm.
3.Sneakers
Cellmark performed a presumptive test for blood, the luecomalachite green (“LMG”) test, on certain parts of the sneakers, including the recessed area of the sole of the left sneaker that had been previously tested for the presence of blood by Sullivan and areas adjacent and/or peripheral to that area. Based on the LMG test, Cellmark concluded that there was no blood on the areas of sneakers that were tested.
Defendants also submitted the affidavit of Peter R. DeForest (“DeForest”), a forensic scientist and criminalist, who reviewed blood testing done in connection with the defendants’ trial so he could “offer an opinion as to the reliability of that testing as compared to other testing that could have been performed at the time.” DeForest opined that confirmatory blood testing should have been performed to determine if blood was on the sneaker before testimony implying the presence of blood was offered because the presumptive test[8] performed by the Commonwealth on the sneaker “was not adequate to draw the conclusion of the presence of blood from a positive result.” Specifically,
As a general matter, a positive result from a presumptive blood test has limited scientific value. A positive result indicates only that there is a possibility that the tested substance contains blood. Such a result allows the analyst to “presume” that blood is present only for the purpose of follow-on testing ... [A] positive result may occur becaúse that reagent reacted with some other substance (e.g., certain household chemicals, fruits, vegetables, soil bacteria, etc.) and generated a positive result with the reagent. Absent further confirmatory testing, one cannot draw a conclusion from presumptive testing to a reasonable degree of scientific certainty that the questioned sample is in fact blood ... In addition, presumptive blood tests lack the ability to identify the species of the blood (i.e., if there is blood, whether that blood belongs to a human or an animal); the age of the sample (i.e., if there is blood, the length of time that a blood stain was present on a particular specimen); and the presence of different genetic markers in the blood (i.e., blood type).
... A positive result merely signifies that further confirmatory testing should be conducted, not that blood is present. By ‘confirmatory’ testing, I mean the use of crystal tests (such as Teichmann (1853) and Takayama (1907)), or an anti-hemoglobin test. These, among others, are specific tests that can be used to confirm that the questioned sample is in fact blood, rather than some other substance.
Further, the presumptive blood test used by the State Police Crime Lab, the orthotolidine test, generates a “blue” color response in the presence of “heme/protein pseudocatalytic activity” found in blood. However, the orthotolidine test also generates a “blue” color in the presence of other non-blood substances such as fruits, vegetables, certain household cleaners, certain industrial chemicals, and soil bacteria. DeForest noted that prior to testing, the sneakers were reportedly outside in a brush-covered field for several weeks and had been exposed to rain and “very possibly” soil bacteria. DeForest also noted that Cowels worked in a print shop where his sneakers may have been “in frequent contact” with various chemicals that may have generated the “blue” response.
DeForest stated that the anti-human hemoglobin test was available in 1994 and could have been performed “on adequately sized samples” to determine whether any of the positive orthotolidine tests results had actually detected blood. Because neither this nor other follow-up testing was done, DeForest believes that “it cannot be said to a reasonable degree of scientific certainty that blood was detected on the sneakers, and, therefore, there is a definite possibility that the test result obtained by Mr. Sullivan was a false positive.”
In response, the Commonwealth submitted the affidavit of Gwen Pino (“Pino”), the Technical Leader of the Criminalistics and Crime Scene Response Unit at the Massachusetts Department of State Police. Pino *350 reviewed the report issued by Sullivan and the affidavit of DeForest and stated:
During [the period in question], the Crime Laboratory policy on positive screening results of an occult (non visible) source was to document the results only. No further follow up testing was performed on the samples and the samples were not collected from this area because technology was not available to confirm (crystal, DNA, or anti-sera based testing) and identify the presence of an occult biological stain. At the time of testing, there were no confirmatory blood tests available for occult sources.
[[Image here]]
The 2006 Cellmark’s [sic] finding on the recessed portion of the sole of the left sneaker is not surprising. The discrepancy in the screening results from 1993 and 2006 can be attributed to the technique of the screening test as well as age and storage conditions of the item. The act of performing the ortho-tolidine test requires the chemist to swipe or swab away materials from the item onto a filter paper and to add the catalytic indicators to the filter paper. This essentially removes a portion or all of the material from the item. Since blood and other body fluid evidence is biological and is rapidly decomposed by bacteria and mold, it is absolutely essential that such evidence is stored properly. In addition to the testing technique, this item was not stored in conditions that would be conducive to additional biological identification of the area.
DISCUSSION
Under Mass.R.Crim.P. 30(b), ajudge may grant a new trial only “if it appears that justice may not have been done.” Commonwealth v. Fanelli, 412 Mass. 497, 504 (1992), quoting Commonwealth v. DeMarco, 387 Mass. 481, 482 (1982), and cases cited. “Judges are to apply the standard set forth in Rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth.” Commonwealth v. Wheeler, 52 Mass.App.Ct. 631, 635, 636 (2001), citing Fanelli, 412 Mass. at 504. Additionally, the decision of whether to hold an evidentiary hearing on a motion for a new trial rests solely with the motion judge, and the judge may decide the motion on the affidavits and the papers if he or she determines that an evidentiary hearing is not useful. Commonwealth v. Stewart, 383 Mass. 253, 257 (1981). Ajudge, however, is required to hold a hearing if a substantial issue is raised by the motion, and the issue is supported by a convincing showing of admissible evidence. Commonwealth v. Lopez, 426 Mass. 657, 663 (1998), citing Stewart, 383 Mass. at 257. “In determining whether a ‘substantial issue’ meriting an evidentiary hearing under rule 30 has been raised, we looknot only to the seriousness of the issue asserted, but also to the adequacy of the defendant’s showing on the issue raised.” Stewart, 383 Mass. at 257-58.
I. Newly Discovered Evidence
“A defendant seeking a new trial on the ground of newly discovered evidence must establish that the evidence was unknown to the defendant or trial counsel and not reasonably discoverable at the time of trial” and “that the evidence ‘casts real doubt on the justice of the conviction.’ . . . The evidence said to be new not only must be material and credible, but also must carry a measure of strength in support of the defendant’s position.” Commonwealth v. Shuman, 445 Mass. 268, 271-72 (2005); see also Commonwealth v. Weichell, 446 Mass. 785, 798 (2006); Commonwealth v. Grace, 397 Mass. 303, 305-06 (1986). To allow a new trial based on newly discovered evidence, the court “must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial . . . The motion judge decides not whether the verdict would have been different, but rather whether the new evidence would probably have been a real factor in the jury’s deliberations.” Grace, 397 Mass. at 306; see Commonwealth v. Tucceri, 412 Mass. 401, 414 (1992) (“It is enough that, on a full and reasonable assessment of the trial record, the absent evidence would have played an important role in the jury’s deliberations and conclusions, even though it is not certain that evidence would have produced a verdict of not guilty”).
The defendants argue that Cellmark’s DNA results constitute “newly discovered evidence”[9] and that because DNA testing shows that the blood on the towels was not that of Cowels, Mims, or Miscioscia, the “bloody” towels, key pieces of forensic evidence upon which the Commonwealth relied at trial, should not have been admitted into evidence.[10] Further, Cowels and Mims argue that the absence of the towels in evidence would have been a real factor in the jury’s deliberations, particularly considering the Commonwealth’s “heavy reliance on the bloody towels to persuade the jury that Salie’s account was true and a fortiori, that the account given by Mims and Cowels was false.”
The basis on which the Commonwealth successfully introduced the “bloody” towels was as follows; Salie testified that Cowels and Mims cleaned up in his bathroom; because testing done on towels found in Salie’s apartment created a presumption that there was human blood on them, the jury could infer that the blood on the towels was from Mims, Cowels, and/or Miscioscia. The court agrees with the defendants that the “bloody” towels would not have been admitted in evidence had DNA testing shown that the blood on the towels was not that of Cowels, Mims, or Miscioscia. The court finds, however, that there is no *351 substantial risk that the juiy would have reached a different conclusion if the “bloody” towels were not in evidence or if the newly discovered DNA evidence was admitted at trial.
The testimony before the juiy regarding the towels was that “tests on the towels were inconclusive, although the chemist at the State police laboratoiy testified that there was a ‘weak reaction’ to the blood type A. Both the defendants and the victim had type O blood.” Cowels, 425 Mass. at 284 n.4. Specifically, Michael Hickey, the attorney for Cowels, elicited the following testimony from Maiy Lumley (“Lumley”), a serologist at the state police crime laboratoiy, during cross-examination regarding the whitish green towel (Exhibit 9):
Q: Based upon your test results, can you say that that’s the blood of Michael Cowels?
A: The testing I conducted on that bloodstain were [sic] inconclusive, so I don’t know who that bloodstain originated from.
Q: Now, with respect to that testing, did you use the ABO testing system on that bloodstain?![11]]
A: Yes, sir, I did.
Q: And is it fair to say you were looking for a positive response, a positive reaction to some type of blood in the ABO system?
A: If the reaction met our criteria, then I could come to a conclusion based on the results of that test. So, I was looking for results from that test.
Q: And did you get—do you have some kind of a scale on which you put down the result, whether you get a positive reaction that’s a weak positive reaction or a strong positive reaction?
A: Yes, sir, in that test, yes.
Q: All right. And within that range of test results, how do you record a strong positive reaction?
A: In that test a strong reaction would be a 4 plus.
Q: And what would a weak positive reaction be?
A: Well, a weak reaction still able to call a result, or a weak reaction just observing something that you don’t know?
Q: A weak reaction?
A: The smallest reaction that could happen and still be considered a positive test would be a 1 plus. A weak reaction that is below our standard for being able to call something is just denoted at plus. No 1 is on it, just a plus. Some of the analysts use the denotation of plus slash minus to indicate the same thing. That type of reaction could be considered a weak reaction, but it’s not a reaction that’s considered good enough to call a result.
Q: And it’s fair to say that you got a weak reaction when you tested on your report the towel listed as 6B, exhibit 9 that I just showed you, is that correct, ma’am?
A: There was a reaction, a weak reaction in the A blood group substances on that towel. The reaction was not of significant quantity to be able to call and it could be attributed to other factors besides blood.
Q: Well, you know that Ms. Miscioscia has type O blood?
A: Yes, sir.
Q: You know that Ms. Miscioscia [sic] has type O blood?
A: Yes, sir.
Q: And you know that Michael Cowels has type O blood?
A: Yes, sir.
Q: And what you’re saying to us is you got a weak reaction for type A blood?
A: I did not draw any conclusion based on that weak reaction. I don’t know what type of blood is on that towel. . .
Q: Does [the document I put in front of you] record a test result with respect to the blood typing or the attempt to blood type item 6B, the towel that is exhibit 9 . . .?
A: Yes, it does.
Q: And is there a column for type A blood?
A: Yes, sir, there is.
Q: And under the column for type A blood, that towel I just showed you, what did you record in the box?
A: There’s a single plus, no 1 in front of it, just a plus.
Q: And type A blood, Mr. Cowels doesn’t have type A blood, does he?
A: No, sir.
Q: Mr. Mims doesn’t have type A blood?
A: No, sir.
Q: Is there a column for type O blood on that test?
A: Yes, sir.
Q: And what did you put there in that column?
A: There’s a negative in that column.
Q: Which means that it was not type O blood, right? A: I don’t know what type of blood it is.
Q: Is it fair to say that test result, the only plus you put down for that item is under type A blood?
A: Type A was the only one that I observed any type of reaction in.
(7-72-76.) Then, during his cross-examination, Arthur Kelly, attorney for Mims, elicited the following testimony:
Q: And would you agree with me that the towels that were submitted to you for your analysis, the tan one and the whitish, greenish one, that you can’t tell *352 this jury that it was Mr. Cowels’s blood, or Mr. Mims’s blood, or Mr. Salie’s blood, or Ms. Miscioscia’s blood, correct?
A: Or your blood. I don’t know whose blood it is.
Q: . . . And in part, some of the blood that was submitted to you from those towels was of such poor quantity and quality that it made it impossible for you to arrive at a conclusion, correct?
A: That’s correct.
(7-82-83.)[12]
In addition, the defendants vigorously argued to the juiy that the test results had no evidentiary value. Specifically, during Attorney Hickey’s closing, he stated:
And of the towels what do we know, that one, the blood testing was inconclusive, and on the other a weak positive reaction, weak enough according to the chemist for her to say that they don’t even report it. But what blood was the weak chemical reaction for, type A blood, which is different from the blood of the three people central to this case, Ms. Miscioscia, Mr. Cowels and Mr. Mims.
And if that weak positive reaction to the blood was type A, then what is the significance of the towel. And if the towel that has the weak positive reaction to type A has the dirt stains on it and if you are to believe that they cleaned everything off of themselves which may have included dirt, wasn’t it easy or wasn’t it fortunate that mixed in with that dirt isn’t some bloodstains. We know that the chemist used the same sensitive test to test that towel . . .
A test so sensitive that one chemist said that it detects one part of blood per one million parts of water. A second chemist said that it’s one part of blood per one hundred thousand parts of water.
(9-23-24.) During Attorney Kelly’s closing, he stated:
But that story, doesn’t it bother you? If [Salie] is to be believed about these two gentlemen coming into his house, washing up, why wasn’t there any blood on the rug. Why wasn’t there any blood on the couch that he slept on. Why wasn’t there any blood in the bathroom. This blood on the towels, ladies and gentlemen, it doesn’t come back to these two men. The best the Commonwealth can tell you is that there was a small reaction to type A, and we know everybody is type O.
So whose blood was it? Was it Robert Salie’s from shaving, I asked him, and he said no, it wasn’t. Wouldn’t there be more evidence if you believe his story. Wouldn’t there have been some blood.
(9-34-35.)
Based on Lumley’s testimony regarding the inconclusive nature of the test results and the reaction, albeit weak, to a blood type that was different than the blood type of Mims, Cowels, and Miscioscia, and Attorneys Hickey and Kelly’s closing arguments highlighting the limited evidentiary value of the “bloody” towels, the court finds that the “bloody" towels themselves were probably not a real factor in thejury’s deliberations. Cf. Commonwealth v. Davis, 410 Mass. 680, 681-82 (1991) (trial counsel “ably exposed deficiencies” in Commonwealth’s forensic evidence and new DNA test, which would show that hair in victim’s hands had not come from defendant or victim but from another, was cumulative of evidence that hair in victim’s hand was not defendant’s); Commonwealth v. Troung, 34 Mass.App.Ct. 668, 673 (1993) (newly discovered evidence was not material if it consisted merely of attaching name to previously unidentified fingerprints, without any additional evidence that this person may have committed the crime). But see Commonwealth v. Bennett, 43 Mass.App.Ct. 154, 162 (1997) (because case was weak one for conviction, “it would be quite natural for the jury to pay attention to collateral factors and even to make them decisive”). It follows that, if the “bloody” towels had been excluded from evidence or if the newly discovered DNA evidence had been admitted at trial, there is no substantial risk that the jury would have reached a different conclusion.
Cowels and Mims also argue, however, that lack of the “bloody” towels in evidence would have been a real factor in the jury’s deliberations because the Commonwealth used the “bloody” towels to corroborate Salie’s account of the events on the night of the murder. Specifically, what further follows from the inference that the blood on the towels found in Salie’s bathroom was that of Mims, Cowels, and/or Miscioscia, is the inference that Salie’s testimony that Cowels and Mims cleaned up in his bathroom after the murder, and to a lesser extent, the whole of his testimony regarding the night of the murder, is true. During closing argument, the prosecutor stated:
[Salie’s] been substantiated . . . And again, the bloody towels. [Salie] tells you that [Cowels and Mims] come into the apartment, they run into the bathroom and they change. They’re in that room for about fifteen minutes. And when the police do a search, what do they find? They find bloody towels. Those towels are in evidence, ladies and gentlemen. Another piece confirming Mr. Salie.
(9-49-50.)
“On a motion for a new trial, evidence of a type merely tending to impeach or to corroborate credibility of a witness ordinarily will not be the basis for ordering a new trial.” Commonwealth v. Shuman, 17 Mass.App.Ct. 441, 448 (1984), overruled in part on different grounds by Commonwealth v. Jones 59 Mass.App.Ct. 157 (2003); see Commonwealth v. Cassesso, 360 Mass. 570, 576 (1971). But cf. Commonwealth v. Liebman, 388 Mass. 483, 489 (1983) *353 (discussing prosecutor’s failure to disclose exculpatory evidence and stating “evidence which impeaches the credibility of a key prosecution witness is exculpatory for the defendant and is clearly material”). In addition, the strength of the case against a defendant may weaken the effect of evidence which is admittedly newly discovered. Commonwealth v. Moore, 408 Mass. 117, 126 (1990); accord United States v. Hernandez-Rodriguez, 443 F.3d 138, 147 (1st Cir. 2006) (court must consider strength of government’s case in light of new evidence).
Although Salie’s testimony was a major part of the Commonwealth’s case, there was other evidence implicating Cowels and Mims. As set forth by the SJC, that evidence is as follows: (1) the fact that the defendants were the last persons seen with Miscioscia, at a time and place in close proximity to where she was shortly thereafter found in a battered condition; (2) both Mims and Cowels had had previous sexual encounters with Miscioscia; (3) Miscioscia left to meet up with Cowels to buy marihuana from him and her body was found in a location described as a “lover’s lane iype area” with a bag of marihuana stuffed inside her bra; (4) Cowels referred to Miscioscia as a ‘pig’ during his interview with police and Mims referred to her as a ‘dirty pig’; (5) Cowels made several damaging statements that directly implicated him in the murder, including “I’m only twenty-three years old. I don’t want to go to jail”; (6) medical testimony indicated that the victim was stabbed by one or possibly two knives; and (7) the defendants “engaged in a considerable common effort to conceal the crime, including disposing of their clothing and other items that could link them to the murder, threatening and intimidating ■witnesses, giving the police false statements, and arranging testimony to support those false statements.” Cowels, 425 Mass. at 282-86.[13]
Further, Salie’s credibility was brought into question numerous times throughout his testimony. Specifically, Salie’s testimony revealed the following: the police interviewed Salie for the first time on June 29, 1993 (5-127). Salie did not tell the police what he testified to at trial (5-127). Salie told the police that Cowels and Mims came to his apartment after 1:00 a.m., stayed for twenty-five minutes to a half hour, and then Cowels left and Mims spent the night (5-134). Salie did not tell the police that he saw Cowels and Mims three times that night and he denied seeing Miscioscia even though he was specifically asked if he had seen her (5-134-35, 5-165).
On July 6, 1993, Salie told the police the same story—that he saw Cowels and Mims once the night of June 26, 1993 and he did not see Miscioscia (5-136-37). Salie gave the police a black Colorado Rockies T-shirt that he said Mims had been wearing when he stayed over (5-167-69). He thoughtitwas Mims’s shirt because it was not his and Cowels was wearing a blue T-shirt (5-167-68). He told the police that he did not want to get involved and that he did not know anything (5-169, 5-183).
On July 13, 1993, Salie told the police the same story—that he saw Cowels and Mims once the night of June 26, 1993 and he did not see Miscioscia (5-136-37). When asked whether Cowels carried any clothing out of his apartment, Salie said no (5-191).
At some point, the police told Salie that he would be charged with accessory after the fact for providing Cowels and Mims with clothes (5-138).[14] On August 4, 1993, Salie went to see an attorney to find out if he was going to be charged (5-139). Salie made an agreement with the district attorney’s office that he would not be considered an accessory after the fact for giving Cowels and Mims clothes if he “told the truth” (5-98, 5-140). He then told the police for the first time that he had seen Cowels three times the night of June 26, 1993, that he had seen Miscioscia at his apartment, that Cowels had threatened his life, and that Cowels had said “f-ing pig, that’s what she deserved” (5-139-40, 5-165, 5-190).
In addition, on July 7, 1993, Salie was charged with use without authority of a motor vehicle, operating so as to endanger, and operating a motor vehicle after his right to operate had been suspended for conviction of operating under the influence of alcohol (5-120). Salie was guaranteed jail time for these offenses (5-124). Further, Salie found out that Cowels was going to be awitness against him (5-126,5-191). Salie reached an agreement with the district attorney’s office that he would not go to jail on the three charges if he cooperated and testified in the case against Cowels and Mims (5-125, 5-174-75).
In light of the numerous reasons put forth at trial for finding Salie’s testimony unreliable and incredible and the other evidence of the defendants’ guilt, particularly Cowels’s statement that he did not want to go to jail and the defendants’ efforts to conceal the crime, the court finds that there is no substantial risk that the jury would have reached a different conclusion if the “bloody” towels were not in evidence or if the newly discovered DNA evidence was admitted at trial. Contrast Commonwealth v. Baker, 440 Mass. 519, 526-28 (2003) (finding prejudicial “occurrence” when Commonwealth’s theory of case was that defendant fatally injured victim by smashing his head into wall of apartment, piece of hair found in indentation in hall was only physical evidence used by Commonwealth to link victim to indentation in wall, and although jury knew, from defendant’s trial counsel’s vigorous questioning of Commonwealth’s forensic chemist, that hair had not been determined to be from victim’s head, prosecutor strongly suggested otherwise in her closing comments to jury, indicating “(t]he fundamental importance of the hair to the Commonwealth’s theory of the case”).[15]
*354 II. Ineffective Assistance of Counsel
Cowels and Mims argue that their attorneys provided constitutionally ineffective assistance of counsel because they failed to: (1) conduct independent forensic testing on the “bloody” sneaker; (2) call Patricia Zampitella (“Zampitella”) as a witness at trial; and (3) adequately cross-examine Peter Rowe (“Rowe”), a boyfriend.of Miscioscia’s, or otherwise develop the defense that Rowe killed Miscioscia. Cowels also argues that Attorney Hickey provided constitutionally ineffective assistance of counsel because he failed to call Randy Jones (“Jones”) as a witness at trial.
The question for the court on an ineffective assistance of counsel claim is “whether there has been serious incompetency, inefficiency, or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer—and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defense.” Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). The defendant must demonstrate that “better work might have accomplished something material for the defense.” Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).
With respect to trial counsel’s decision as to tactical or strategic decisions, the defendant must show that those decisions were “manifestly unreasonable” when made. Commonwealth v. Finstein, 426 Mass. 200, 203 (1997); see also Baker, 440 Mass. at 529, quoting Strickland v. Washington, 466 U.S. 668, 690-91 (1984) (“[Strategic choices made after less than complete investigation are reasonable [only] to the extent that reasonable professional judgments support the limitations on investigation”). The burden of establishing ineffective assistance of counsel rests upon the defendant. Commonwealth v. Filippidakis, 29 Mass.App.Ct. 679, 688 (1991). “Judicial scrutiny of counsel’s performance must be highly deferential.” Commonwealth v. Florentino, 396 Mass. 689, 690 (1986).
1. Failure to conduct independent forensic testing on the “bloody” sneaker
The defendants contend that trial counsel was ineffective for not conducting independent forensic testing on the “bloody” sneaker because additional testing would have shown that there was no blood on the sneaker. [16]
“[T]rial counsel was under a duty imposed by both State, see Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), and Federal, see Strickland v. Washington, 466 U.S. 668, 690 (1984), constitutional law, to conduct an independent investigation of the facts, including an investigation of the forensic, medical, or scientific evidence on which the Commonwealth intended to rely to prove the defendant’s guilt.” Baker, 440 Mass. at 529. An attorney, however, does not have to pursue every possible avenue in order to forestall an ineffective assistance of counsel claim. Commonwealth v. Britto, 433 Mass. 596, 604 (2001).
The only test defense counsel could have ordered done on the sneaker was another presumptive blood test as there were “no confirmatoiy blood tests available for occult sources.” See Pino Affidavit. But see DeForest’s Affidavit at 17 (“The anti-human hemoglobin test[, a confirmatory test,] was available to forensic scientists in 1994”). Without determining whether counsel’s performance was deficient, see Florentino, 396 Mass. at 690, citing Strickland, 466 U.S. at 697 (if defendant fails to fulfill either element of .test, court need not consider other element), the court finds that the failure to conduct an independent investigation regarding the “bloody” sneaker did not deny Cowels or Mims a substantial ground of defense because the sneakers had independent evidentiary value in that they showed consciousness of guilt and corroborated Salie’s testimony.[17] Even without the blood, the sneakers were an important piece of prosecutorial evidence. Contrast Baker, 528 Mass. at 529 (and counsel failed to pursue any avenue of investigation with regard to the hair) and Commonwealth v. Haggerty, 400 Mass. 437, 441 (1987) (finding ineffective assistance of counsel when defense counsel did not investigate the only realistic defense defendant had).
2. Failure to call witnesses to testily
Cowels and Mims contend that Zampitella would have corroborated their alibis and undermined the credibility of Salie and another Commonwealth witness. Cowels contends that Jones would have also have corroborated Cowels’s alibi and undermined the credibility of Salie.[18]
Ineffective assistance of counsel is not established “merely by showing that the defendant’s counsel did not call additional witnesses.” Commonwealth v. Ortega, 441 Mass. 170, 178 (2004). Instead, defendants must show that the purported testimony would have been relevant or helpful. Id. at 179, citing Commonwealth v. Beauchamp, 49 Mass.App.Ct. 591, 609-10 & n.23 (2000) (defendant must show that counsel’s fault probably led to forfeiture of otherwise substantial ground of defense); see also Britto, 433 Mass. at 602 (decision to call witness is tactical judgment that amounts to ineffective assistance of counsel only if manifestly unreasonable when made).
a. Zampitella
Zampitella’s affidavit states that on June 26, 1993, at about 10:00 p.m., she received a call from Cowels who told her he was at Triple O’s and asked if Zampitella wanted to meet him there. Zampitella knows “it was right around 10:00 p.m. because I was waiting for my boyfriend to call me at that time, but instead received a phone call from [Cowels].”[19]
*355 Cowels and Mims argues that this testimony would have corroborated their statement to police that they were with Miscioscia at Triple O’s between 8:00 p.m. and 11:00 p.m. on June 26, 1993, discredited Salie’s assertion that Cowels, Mims, and Miscioscia were at his apartment at 10:00 p.m. having sex, and cast doubt on the testimony ofTriple O’s bartender, Larry Bavis (“Bavis”), that Cowels and Mims were not at Triple O’s between 8:00 p.m. and 11:00 p.m.[20]
To the extent that Zampitella’s statements are hearsay, the court will not consider them. See Commonwealth v. Goodreau, 442 Mass. 341, 352 n.6 (2004) (judge can ignore hearsay evidence in affidavit); Grace, 397 Mass. at 312 (“Itwould not have been error to have excluded the affidavits to the extent they represented what the affiants were told by others”). In addition, the court does not find Zampitella’s affidavit credible, particularly considering she now says that Cowels told her he was at “Triple O’s” when in her initial statement to police she only said “he sounded like he was in a bar.” In addition, Zampitella admits that she and Cowels are friends. See Commonwealth v. Morales, 453 Mass. 40, 46 (2009) (judge was not obligated to credit affidavit); Grace, 370 Mass. 746, 752 (1976) (same).
b. Jones
Cowels claims that Jones will testify that he saw Cowels sitting in his car on Washington Avenue in front of “Rizzo’s” house at 11:30 p.m. on June 26, 1993. Cowels argues that this testimony would have corroborated his statement to police that he and Mims dropped Miscioscia at Rizzo’s house party around 11:30 p.m. and discredited Salie’s assertion that Cow-els and Mims showed up at his house at 11:30 p.m., having already killed Miscioscia.
Cowels has failed to show that Jones’s testimony would have contributed materially to his defense or that trial counsel’s failure to call him was manifestly unreasonable. Cowels provided no affidavit from Jones setting forth the testimony he would have given had he been called as a witness. See Morales, 453 Mass. at 49; Commonwealth v. Collins, 36 Mass.App.Ct. 25, 30 (1994) (withoutaffidavits, noway to determine whether prospective witness’ testimony would likely have made material difference). Counsel’s affidavit setting forth Jones’s testimony is nothing more than hearsay. See Morales, 453 Mass. at 49, citing Ortega, 441 Mass. at 178-79.
3. Failure to adequately cross-examine Rowe or develop the defense that Rowe killed Miscioscia.
Cowels and Mims contend that Rowe had the motive and opportunity to kill Miscioscia and counsel was ineffective for not developing this theory.[21]
The testimony regarding Rowe was as follows: Rowe and Miscioscia had been seeing each other for approximately three to four months prior to June 26, 1993 (2-140, 3-18). They would go out two or three evenings a week and had been out the night of June 25, 1993 (2-194, 3-20, 3-33). On the night of June 26, 1993, Rowe came over at approximately 7:00 p.m. to pick up Miscioscia to go to the Wonderland Ballroom (2-114, 2-140, 3-20, 3-114). Rowe brought over a twelve pack and drank some beers with Miscioscia, Cheryl Tatarouns (“Tatarouns”) and William Brown (“Brown”), Miscioscia’s brother and his girlfriend (2-114, 3-22). At approximately 8:50 or 8:55 p.m., Miscioscia left to go meet Cowels and did not come back (2-125, 3-25).
After approximately an hour, around 10:00 p.m., Rowe figured Miscioscia was not coming back and left (2-176, 3-26, 3-95, 3-116). Rowe told Brown and Tatarouns that he was going to go to a friend’s party (3-26). In fact, there was no party and Rowe was “just looking for a smooth exit.” (3-26, 3-58). Rowe was “upset” that Miscioscia had not returned (3-48, 3-74).[22] He testified that Miscioscia had stood him up on four to five other occasions (3-48). Rowe started to drive home, but ended up at The Squire Lounge in Revere for approximately an hour before he went home (3-26, 3-43, 3-58). Rowe arrived at The Squire Lounge around 10:00 or 10:15 p.m. and had two or three beers (3-61). He arrived home at approximately 11:30 p.m. (3-26).
Miscioscia was dating John Treoli (“Treoli”) at the same time she was dating Rowe (2-193).[23] Rowe knew that Miscioscia was dating other people, including “John” and “Paul” (3-48, 51). Rowe had met John on two or three occasions, the last time approximately two weeks prior to June 26, 1993 (3-52). Three weeks prior to June 26, 1993, John had called Rowe names and had taken a swing at him (3-35, 3-81, 3-83).
The court finds that defense counsel was successful in introducing to the jury the possibility that Rowe killed Miscioscia. Contrast Commonwealth v. Farley, 432 Mass. 153, 156 (2000) (finding counsel ineffective for failing to “investigate and develop the evidence which could have supported the defendant’s defense and which could have raised a reasonable doubt in the minds of the jurors”). See Cowels, 425 Mass. at 284 (“For their part, the defendants contended that they did not commit the crime. They attacked the Commonwealth’s case ... by suggesting that other men may have committed the murder”). Trial counsel’s efforts, although unsuccessful, were competent and reasonable, and did not fall “measurably below that which might be expected from an ordinary fallible lawyer.” Saferian, 366 Mass. at 96; see also Commonwealth v. Bart B., 424 Mass. 911, 916 (1997) (“In general, failure to impeach a witness does not prejudice the defendant or constitute ineffective assistance”).
*356 ORDER
For the reasons discussed above, the defendant, Michael Cowels’s, Amended Motion for New Trial is DENIED and the defendant, Michael Mims’s, Motion for a New Trial is DENIED.[24]

Copies of these decisions are attached. [Editor’s Note: The two referenced federal opinions have not been reproduced with this Massachusetts Superior Court opinion.]

This motion “amends and supersedes” the pending pro se Motion for New Trial (Docket no. 62).

Salie did not actually see them having sex (5-147-48). When Salie left the room, Miscioscia had her bra and pants on and was standing next to the bed (5-148).

Salie testified that the towels had been on the rack in the bathroom and were clean before Cowels and Mims arrived at 11:30 p.m. on June 26, 1993 (5-90, 5-154).

Sullivan testified that exposure to water would lessen or diminish the amount of blood on the sneakers (6-31).

The orthotolidine test can detect one part per million of blood (6-37).

Sullivan has seen many red-brown stains that are not blood (6-36).

DeForest stated that presumptive tests for blood including, orthotolidine and LMG, were available and used in 1993 and 1994.

The Commonwealth does not dispute that the DNA results are “newly discovered,” so the court will assume as much for purposes of this motion.

The defendants acknowledge that the new blood evidence pertaining to Cowels’s sneaker is not “newly discovered” because the LMG test from which the blood evidence derives was recognized and commonly used as a reliable test for the detection of blood prior to, and at the time of their trial. The defendants argue, however, that counsel should have hired their own expert to conduct the LMG test (or another confirmatory blood test), and failure to have done so constituted ineffective assistance of counsel.

 Burnley identifies certain genetic markers in a person’s blood (7-9). These genetic markers allow her to opine whether a particular sample could have come from a person or if a person is excluded as being a possible source of the sample (7-9). The main genetic marker is the ABO system (i.e., A type blood, B type blood, AB type blood, O type blood) (7-9). Mims, Cowels, and Miscioscia all have O type blood (7-19, 7-37, 7-45). Forty-five percent of the Caucasian population in the United States has O type blood (7-20, 7-37).

Lumley did not conduct tests on the tan hand towel (Exhibit 10) because she would have had to use up the entire sample and the crime lab is not allowed to exhaust a sample (7-27, 7-34, 7-71-72).

Additionally, there was some evidence corroborating Salie’s story. Specifically, there was testimony that Mims wore shoes loaned to him by Salie the day after the murder and when questioned, Mims explained that he has thrown his shoes out because they had gotten “all wet and squeaky” in the rain the previous night even though there had been no rain the previous night. Cowels, 425 Mass. at 282.

Salie testified that it was the third time the police met with him (5-138).

Cowels further argues that Cellmark’s testing on the vaginal swab “proves” that Cowels did not have sexual intercourse with Miscioscia the evening she was murdered and if this evidence had been available at the time of trial it would have undermined the Commonwealth’s theory of motive that Cowels and Mims killed Miscioscia because she was a mere sexual object to be disposed of, established that Cowels was telling the truth when he insisted that he had not had sex with Miscioscia, and further impeached the testimony of Salie. The court disagrees. First, as pointed out by the Commonwealth, the testing does not “prove” that Cowels did not have sex with Miscioscia the evening she was murdered. Second, Salie did not specifically testify that Cowels had sex with Miscioscia; he never saw them having sex and admitted that when he left the room, Miscioscia still had her pants on (5-147-48). Finally, even if Cowels did not have sex with Miscioscia the night in question, Cowels made statements to the police indicating that he believed Miscioscia was a “mere sexual object.” Cowels told the police he had had sexual relations with Miscioscia in the past and referred to her as a “pig” (4-66-67, 5-245). When referencing a threesome Miscioscia had with Cowels and Mims, Cowels said “that’s just the type of pig she is” (4-67, 5-245).

The court notes the absence of affidavits from trial counsel outlining their strategies for not independently conducting tests on Cowels’s sneakers. See Commonwealth v. Lynch, 439 Mass. 532, 539 n.2 (2003) (“[I]t is significant that no affidavit from trial counsel was submitted in connection” with the motion for new trial). Current counsel contacted Attorneys Hickey and Kelly and neither of them had a memory of whether they sought to have independent blood testing performed on Cowels’s sneakers. While Attorney Hickey stated that he “did not believe that he would have ordered independent blood testing of Mr. Cowels’s sneakers,” the reasons for why he would not have ordered independent blood testing are speculative. See Commonwealth v. Rice, 441 Mass. 291, 303 (2004), citing Commonwealth v. Knight, 437 Mass. 487, 502 & n.17 (2002) (defendant’s assertions about what counsel did not do is speculative and need not be considered).

Salie testified that Cowels was wearing Converse sneakers on the night of the murder (5-49). Polovick testified that when he asked Cowels about a pair of white Converse sneakers in Cowels’s trunk being the notorious sneakers, Cowels said yes and threw the sneakers away (4-209-10).

The court again notes the absence of affidavits from trial counsel outlining their strategies. See Commonwealth v. Novo, 449 Mass. 84, 97 (2007) (“We have no way of knowing the reasons on which ... trial counsel based his decision not to call any of the three witnesses to testify for the defense”).

In a police report dated November 14, 1994, Zampitella stated that when Cowels called, “he sounded like he was in a bar.”

Bavis did not testify that Cowels and Mims were not at Triple O’s between 8:00 p.m. and 11:00 p.m. on June 26, 1993. Bavis simply testified that he did not play pool with Mims and Cowels at Triple O’s between 8:00 p.m. and 11:00 p.m. on June 26, 1993 because he, meaning Bavis, was not there (5-198-200). Thus, any testimony that Cowels and Mims were at Triple O’s at 10:00 p.m. would not “cast any doubt” on Bavis’s testimony.

The court again notes that there are no affidavits from Attorneys Hickey and Kelly indicating whether they investigated Rowe.

Tatarouns testified that Rowe was “a little angry that he had been stood up” (2-176).

Miscioscia invited Treoli to Tatarouns’s child’s christening on June 27, 1993 (2-194).

The defendants’ request for an evidentiary hearing is denied. After thorough review of the affidavits and trial transcripts, the court concludes that the defendants have failed to show that such a hearing would serve any purpose.